**CRANE HELICOPTER SERVICES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 93–322C.

United States Court of Federal Claims.

Nov. 23, 1999.

Christopher B. Ingram, Haas & Najarian, San Francisco, California, attorney of record for plaintiff/counter-defendant.

Lance J. Lerman, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Sharon Y. Eubanks, Deputy Director, and David M. Cohen, Director, attorneys of record for the defendant/counter-plaintiff.

## ORDER

HORN, Judge.

This case originally came before the court on the claim of plaintiff/counter-defendant Crane Helicopter Services, Inc. (Crane) for damages arising from the conduct of defendant/counter-plaintiff United States of America with regards to a forest fire suppression contract which the government awarded to Crane. Defendant counter-claimed that plaintiff had committed fraud because Crane "falsely represented its aircraft as a civilian

aircraft to gain the FAA certifications," and "[w]ithout appropriate FAA certifications, Crane's helicopter is ineligible for award of the type of contract that is at issue in this case."

After full consideration and reconsideration of the voluminous and technical record developed during the trial of this case, the court has concluded that the government's fraud claims must fail. The government has failed to prove that Crane's helicopter is not a commercial Bell 204B "Super." Therefore, the government has failed to prove that plaintiff made misrepresentations of fact or false statements by identifying the helicopter as such. Furthermore, even if the court were to find that the helicopter is not a commercial Bell 204B, the government also has failed to prove that Crane had the necessary knowledge of that fact as required under the fraud theories on which the government bases its counter-claims.

## FINDINGS OF FACT

### I. Introduction

The plaintiff, Crane Helicopter Services, Inc. (Crane), has been in business since 1979 and is owned and operated by Steven W. Lotspeich and his wife, Linda Lotspeich. During its years of operation, Crane has owned and operated several different helicopters, using them for construction and movie-making jobs, as well as firefighting for the United States Forest Service (Forest Ser-

vice) and the California Department of Forestry. On January 11, 1990, Crane purchased what it claims is a refurbished and overhauled Bell 204B "Super" helicopter with the serial number 2030 (S/N 2030).[1] Crane employed this helicopter for firefighting from 1990 through 1995.

A mandatory availability Contract No. 55–024B–2–718 was awarded to Crane by the Forest Service on February 14, 1992.[2] Under the terms of the contract, Crane agreed to provide helicopter services to assist in the administration and protection of public lands. Plaintiff was to provide a specific type of helicopter for use in fire initial attack and support missions, and for other administrative flights as assigned. The contract required Crane to be certified by the Federal Aviation Administration (FAA) under Federal Aviation Regulation Parts 133,[3] 135,[4] and 137.[5] The contract required Crane to identify the helicopter it would use by make, model, and series on the Part 135 Certificate. Plaintiff indicated that it was furnishing a Bell 204B "Super."

During the performance of Contract No. 55–024B–2–718, Crane bid for, and allegedly its bid was accepted for, a separate call-when-needed firefighting contract with the Forest Service. The Forest Service, however, refused to execute a formal call-when-needed contract with Crane and instead offered plaintiff work pursuant to the "optional use" clause of Contract No. 55–024B–2–718.

---

1. A Bell 204B "Super" is a Bell 204B helicopter which has been modified to contain a more powerful Lycoming T53–13B engine.

2. For medium and heavy lift helicopters, such as the one owned by Crane, there are three types of Forest Service firefighting contracts: (1) mandatory availability contracts, (2) call-when-needed contracts, and (3) severity work contracts. Under a mandatory availability contract, the Forest Service will specify a "mandatory availability period," with a start date and a period of time during which the employed helicopter must remain at its assigned base, subject to call by the Forest Service at all hours. Under call-when-needed contracts, helicopters are used when needed. Companies awarded call-when-needed contracts are not obligated to accept all work offered, and are free to contract for other work during the same period. Last, a severity work contract is a modified call-when-needed contract

and is used when the Forest Service requires additional assistance due to the severity of a fire situation. In such a situation, the Forest Service can guarantee a period of uninterrupted work.

These firefighting contracts are all awarded by the National Interagency Fire Center (NIFC) in Boise, Idaho. The NIFC is a joint operation with the Department of Interior, including the National Park Service, the Bureau of Land Management, the Bureau of Indian Affairs, and other agencies of the Department of Interior having firefighting responsibilities for public lands.

3. 14 C.F.R. § 133 (1992), concerning External Load Operations.

4. 14 C.F.R. § 135 (1992), governing Air Taxi Operators and Commercial Operators.

5. 14 C.F.R. § 137 (1992), concerning Agricultural Aircraft Operations.

Between May and September of 1992, Crane alleges that the Forest Service improperly restricted plaintiff to performing selected work at the "optional use" rate of Contract No. 55–024B–2–718, when plaintiff could have been bidding on, and performing, other call-when-needed contracts under more favorable terms.

On October 12, 1992, Crane submitted a claim for compensation to the government pursuant to the terms of a disputes clause in Contract No. 55–024B–2–718. The government denied the claim in a final decision dated December 7, 1992. On January 8, 1993, plaintiff submitted a second claim to the government. It asserted that Crane was entitled to have a formal call-when-needed contract executed, and that Crane was entitled to be placed on the Forest Service's list of call-when-needed contractors. The government responded to this second claim by agreeing to execute a formal call-when-needed contract with plaintiff. On or about May 10, 1993, the Forest Service officially awarded Contract No. 55–024B–2–731(F5) to Crane Helicopter Services, Inc. The contract was back-dated to May 14, 1992 and accompanied by a modification renewing the contract for one year beginning May 14, 1993.

Crane filed the complaint at issue against the United States under 28 U.S.C.A. § 1491 (West 1988 & Supp.1993) [6] and the Contract Disputes Act of 1978, 41 U.S.C.A. §§ 601–613 (West 1988 & Supp.1993). The complaint seeks damages from the government under six different theories: (1) breach of contract, (2) economic duress, (3) cardinal change of Contract No. 55–024B–2–718, (4) failure to disclose superior government knowledge, (5) breach of a duty to cooperate and (6) improper administration of a contract. After conducting lengthy discovery, the government filed an Amended Answer and Counterclaim. Defendant asserts as an affirmative defense that Crane's claims are barred by accord and satisfaction, and defendant counter-claims that it is entitled to damages because Crane has committed fraud.

The government alleges that, "before award of the contract at issue, Crane was made aware that its helicopter was not a commercial Bell 204B series aircraft." Defendant claims that "Crane has falsely represented its aircraft as a civilian aircraft to gain [its] FAA certifications," and that "[w]ithout appropriate FAA certifications, Crane's helicopter is ineligible for award of the type of contract that is at issue in this case." Consistent with these allegations, the government's fraud counterclaims seek remedies under (1) a Special Plea in Fraud statute, 28 U.S.C.A. § 2514 (West 1988 & Supp. 1992), (2) common law fraud jurisprudence, (3) the False Claims Act, 31 U.S.C. § 3729 (1988), and (4) the Contract Disputes Act, 41 U.S.C. § 604 (1988). Defendant requests compensatory damages, treble damages, punitive damages, penalties, restitution, recision of the contracts at issue and forfeiture of Crane's entire claim.

The court separated the fraud issues from the other issues presented by Crane's complaint and the government's counter-claims. A lengthy, complex trial was held on the fraud issues [7] in which the court heard voluminous testimony concerning (1) whether Crane's aircraft is, in fact, a commercial Bell 204B, and (2), if not, whether Steve and Linda Lotspeich were aware or should have been aware that their helicopter was not a Bell 204B. In order to frame the court's discussion of the issues in this case, a history of Bell 204B Serial - Number 2030 and the

---

**6.** That section reads as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

28 U.S.C.A. § 1491(a)(1).

**7.** Trial was conducted in a manner best-suited to accommodate the parties and the witnesses. As plaintiff's post-trial brief notes:

> Trial was conducted in five phases over a period of seven months, including three phases in San Francisco, a phase in Boston, and one in Sacramento, California, as well as a one-day "site visit" in Stockton, California, to view the helicopter in question. The trial consumed 35 court days. Twenty-two witnesses were called. One hundred ninety-two exhibits were admitted into evidence....

Lotspeiches' involvement with the helicopter was presented at trial and is discussed below.

## II. The early history of Bell 204B Serial Number 2030

Bell Model 204B Serial Number 2030 (S/N 2030) was manufactured by Bell Helicopter in 1965, and the FAA issued a standard airworthiness certificate for the helicopter on July 17, 1965.[8] At this time, the aircraft possessed cabin steps, and Bell also added military communications gear to S/N 2030, with official approval via an FAA Major Repair and Alteration Form 337.[9] In addition, Bell made several other modifications which substituted military components for their civilian counterparts. Bell sold S/N 2030 to

8. 14 C.F.R. § 21.183 (1992) details the conditions which must be met for the issuance of standard airworthiness certificates for most types of aircraft:

(a) *New aircraft manufactured under a production certificate.* An applicant for a standard airworthiness certificate for a new aircraft manufactured under a production certificate is entitled to a standard airworthiness certificate without further showing, except that the [FAA] Administrator may inspect the aircraft to determine conformity to the type design and condition for safe operation.

(b) *New aircraft manufactured under type certificate only.* An applicant for a standard airworthiness certificate for a new aircraft manufactured under a type certificate only is entitled to a standard airworthiness certificate upon presentation, by the holder or licensee of the type certificate, of the statement of conformity prescribed in § 21.130 if the Administrator finds after inspection that the aircraft conforms to the type design and is in condition for safe operation.

* * * * * *

(d) *Other aircraft.* An applicant for a standard airworthiness certificate for aircraft not covered by paragraphs (a) through (c) of this section is entitled to a standard airworthiness certificate if-

(1) He presents evidence to the Administrator that the aircraft conforms to a type design approved under a type certificate or a supplemental type certificate and to applicable Airworthiness Directives;

(2) The aircraft ... has been inspected in accordance with the performance rules for 100–hour inspections set forth in § 43.15 of this chapter and found airworthy by-

(i) The manufacturer;

(ii) The holder of a repair station certificate as provided in Part 145 of this chapter;

(iii) The holder of a mechanic certificate as authorized in Part 65 of this chapter; or

(iv) The holder of a certificate issued under Part 121 or 127 of this chapter, and having a maintenance and inspection organization appropriate to the aircraft type; and

(3) The Administrator finds after inspection, that the aircraft conforms to the type design, and is in condition for safe operation. *The importance of the type certificate, in turn, is demonstrated through its definition in 14 C.F.R. § 21.41 (1992):*

Each type certificate is considered to include the type design, the operating limitations, the certificate data sheet, the applicable regulations of this subchapter with which the Administrator records compliance, and any other conditions or limitations prescribed for the product in this subchapter.

At trial, defendant's expert in aviation related matters, Frederic L. Wilken, explained the significance of the type and airworthiness certificates:

The FAA has a system where a company can present an aircraft to the FAA with all the details about that aircraft, and that company can be awarded the rights to produce that aircraft. The aircraft is evaluated. Its design is evaluated by the FAA. All the drawings, the blueprints, the heart of the helicopter, are produced for the FAA. They're all evaluated by FAA engineers and in this case, the helicopter directorate of the FAA is in Ft. Worth, Texas. So, [after approval] the FAA issues a type certificate to this specific helicopter, the 204B. The type certificate H1SW is the identifier for the 204B type certificate.

... That gives the manufacturer the authorization to build the helicopter on his own. He can produce it, he can follow the blueprints, he can build it. He can test fly it. He can then present it to FAA-authorized individuals to issue what is called an air worthiness certificate. The air worthiness certificate is issued at the completion of the building of the helicopter and [after] all the tests that are performed.

What the air worthiness certificate means is that the helicopter is safe to fly. . . .

He further clarified the process: "You have to build the helicopter, you have to fly the helicopter, you have to comply with the type certificate requirements and the design drawings in building the helicopter. When that's all complete and the helicopter is inspected from top to bottom, then an airworthiness certificate is issued [for the individual helicopter.]"

9. 14 C.F.R. § 43 Appendix A (1992) provides a list of alterations which, when not listed in the aircraft specifications issued by the FAA, are "airframe major alterations." 14 C.F.R. § 43 Appendix B (1992) then requires that each person performing a major repair or major alteration must execute an FAA Form 337 and forward a copy of that form to the local FAA Flight Standards District Office within 48 hours after the aircraft is approved for return to service.

Air America in September of 1965, and it was registered originally to Air America under the number N8514F. The original Bell Model 204B, Serial Number 2030 possessed cabin steps. Moreover, Bell 204B S/N 2030 was sold to Air America with military-type pilot and copilot seats and dual controls.

Air America operated S/N 2030 until 1976. During that time, Air America executed a Form 337 for the addition of a rotorbrake to the helicopter. While Air America operated S/N 2030 in Southeast Asia during the Vietnam War, plaintiff alleges that "it remained registered with the FAA, and it was operated under an FAA Certificate of Airworthiness." On February 23, 1976, Air America sold the helicopter to Omni Aircraft Sales of Washington, D.C. On September 11, 1976, Omni Aircraft Sales removed S/N 2030 from the FAA registry and sold it to GreenlandAir Charter, a Danish corporation. Before moving the helicopter to Greenland, GreenlandAir contracted with Wilco Aviation, a Part 145 FAA-certified repair station[10] based in Ozark, Alabama, to repair and refurbish S/N 2030 and five other 204Bs which GreenlandAir had purchased from Air America. During the refurbishment, another Form 337 was executed and auxiliary fuel tanks and associated plumbing were added to S/N 2030 so the helicopter could be used for long flights over water. For the over-water flights, Wilco also appears to have installed fixed floatation landing gear and a long-range radio. On February 6, 1977, a cross-tube on the landing gear of S/N 2030 failed while the helicopter was operating in Sondre Stromfodje, Greenland, causing significant damage to the underside of the aircraft.

Until approximately 1980, the record is unclear as to the location and use of S/N 2030 after the accident in Greenland. From 1980 to 1985, the helicopter was registered as a Bell 204B in Canada. In 1985, Carroll "Bill" Williams, of Southern Aero Corporation in Ozark, Alabama, formerly of Wilco Aviation, became aware that S/N 2030 was available for purchase from its Canadian operator. Mr. Williams or Southern Aero[11] purchased S/N 2030 in September of 1985 and transported it by trailer from Canada to Alabama. Southern Aero then executed a Form 337 and installed a more powerful Lycoming T53–13B gas turbine engine in Bell 204B Serial Number 2030 in accordance with Supplemental Type Certificate SH98450. In addition, S/N 2030 was certified under Part 133 to carry external loads and under Part 135 for commercial operations. From January of 1986 to January of 1988, Southern Aero operated and/or leased S/N 2030 in Alabama, Colorado, Washington, and in the country of Spain.

On January 28, 1988, while leased to Tensaw Helicopters of Mobile, Alabama, S/N 2030 ran out of fuel and crashed five miles outside of Stockton, Alabama. Representatives of the National Transportation Safety Board (NTSB), Bell Helicopter and Lycoming investigated the crash. The NTSB report stated, "A data plate attached to the airframe identified it as a 204B Model helicopter, serial number 2030, manufactured by Bell Helicopter." The report described the incident as follows:

> On January 28, 1988, at about 1745 hours central standard time, N8514F, a Bell 204B helicopter, crashed into the trees

---

**10.** Under 14 C.F.R. § 145.51 (1992), a repair station which has been certified by the FAA may do the following:

(a) Maintain or alter any airframe, powerplant, propeller, instrument, radio, or accessory, or part thereof, for which it is rated;

(b) Approve for return to service any article for which it is rated after it has been maintained or altered;

(c) In the case of a station with an airframe rating, perform 100–hour, annual or progressive inspections, and return the aircraft to service; . . .

However, a certificated repair station may not approve for return to service any aircraft, airframe, aircraft engine, propeller, or appliance

after major repair or major alteration unless the work was done in accordance with technical data approved by the Administrator.

**11.** Williams was formerly with Wilco Aviation, which ceased operations in June of 1981 due to a fire and explosion which destroyed its facility. Wilco's personnel afterwards briefly continued work as Southern Helicopters, Inc., before finding a new facility and forming Southern Aero Corporation in 1982. Southern Aero operated as a Part 145 repair station and had Wilco's type certificate data sheets transferred to the new corporation, and new certificates were issued by the FAA.

and swamp while attempting to execute a forced landing. N8514F was registered to Bill Williams and leased to and operated by Tensaw Helicopters, Inc. The aircraft reportedly lost power while in cruise flight in visual meteorological conditions. The logging operation was being conducted under visual flight rules without a recorded flight plan. The aircraft was destroyed and the certificated commercial pilot received serious injuries. The flight originated at Stockton, Alabama, on January 28, 1988, at about 1615 hours.

\* \* \*

The aircraft was located upside down in the swamp, it had collided with some trees prior to impacting the water.

The NTSB report documented the damage to the aircraft in great detail. A section titled "WRECKAGE AND IMPACT INFORMATION" described the recovery of the wreckage and the condition of S/N 2030 after the crash. Pertinent parts of that section read:

*Recovery*

\* \* \*

The wreckage was partially disassembled for ease of recovery. The main transmission, including rotor head and damaged blades was removed from the wreckage as a unit. The tail boom, including the drive shafting, tail rotor and gear box were removed as a unit. The main fuselage was then retrieved as a unit.

*Fuselage*

Initial examination of the fuselage revealed that the primary damage to the aircraft was on the nose and the top of the forward cabin. The forward left hand corner of the cockpit roof was compressed downward. There were several tree limbs imbedded in the bottom of the fuselage. The right side of the nose was compressed aft and to the left. The right side of the nose of the aircraft under the right side of the cockpit was compressed aft and upwards.

\* \* \*

Both of the skids were damaged and they along with most of the cross tubes were separated from the fuselage. Both Main rotor blades were broken about 3 feet from the grip end. One main spar remained attached and one broke free.

*Tail Boom*

The tail boom had a large impact mark, with bark particles still adhering to the skin, and a compression on the left side. There was a break in the tail boom just forward of the 42 degree gear box.

The tail rotor drive shaft was retrieved in several pieces. The breaks were typical torsional overloads.

*Fuel System*

Examination of the fuel system showed that the system had not been corrupted in the accident. . . .

\* \* \*

*Engine*

Examination of the engine failed to reveal any mechanical defect which would prohibit it from running. . . .

In a chart which appears later in the NTSB report, the investigator was given the opportunity to identify the "Aircraft Damage." Given the choices of "None," "Minor," "Substantial" and "Destroyed," the investigator marked "Destroyed." However, in the more-detailed "Crash Kinematics" supplement to the NTSB report, the investigator did not indicate that same level of damage. In a box titled "Fuselage Totally Destroyed," the investigator indicated "No." Another box, titled "Cockpit Damage," listed the following choices: "Destroyed," "Collapsed," "Part collapsed," "Distorted," "Burnt," "Intact," "None" and "Other." The investigator marked "Part collapsed." Another box offered these same choices for an assessment of forward cabin damage, and the investigator chose "Intact." Furthermore, the same page of the report indicated that the fuselage was not split, and that "Fuselage collapse" and "Fuselage crush" were not pertinent.

Southern Aero was certified by the FAA to do airframe repairs on several different helicopters, including Bell 204Bs. After the accident, Southern Aero moved S/N 2030 back to its facility and repaired the helicopter. According to Mr. Williams, "[t]he repair was accomplished using a jig fixture that had been designed by Bell Helicopter Textron for that purpose. Although that's quite an extensive process, it's not something that you have to be superhuman to accomplish." Mr. Williams also noted that, at that time, Southern Aero had between twelve and twenty-five licensed mechanics on staff who were FAA-authorized, one or two full-time specialists in the skin repair of helicopters, and highly qualified sheetmetal technicians who were concurrently employed at the nearby Fort Rucker Army installation.

### III. The purchase of Serial Number 2030 by Crane Helicopter Services and subsequent events

Steve Lotspeich first learned to fly helicopters in the Army in 1966, eventually gaining 1800 hours of flight time both in combat in Vietnam and as an Army flight instructor. Since approximately 1970, he has accumulated at least 14,000 hours as a helicopter pilot in command, mainly through firefighting work, but also as an instructor and in construction and movie-making. He has been employed at various times by the United States Forest Service, the United States Bureau of Land Management and the California Department of Forestry. The FAA has issued Lotspeich an airframe and power plant mechanic's license (an "A & P"),[12] and has given him inspection authorization (an "IA").[13]

In 1989, Steve and Linda Lotspeich decided that they would "go back into the helicopter business after being out of it for a year." They wanted a helicopter which was power-

ful, but which the two of them could operate without additional employees. After considering several different helicopter models, the Lotspeiches concluded that the Bell 204B "Super" would best suit their needs. As only Southern Aero had FAA approval to place the more powerful Lycoming T53–13B engine in a Bell 204B helicopter, thereby making it a "Super," Southern Aero was the only source for the "Super," apart from resellers. Late in 1989, Steve Lotspeich saw a "for sale" advertisement from Southern Aero in Trade–A–Plane magazine describing a Bell 204B "Super" Serial Number 2056. He called Southern Aero and requested a specifications sheet and a price quote. After receiving this information via facsimile on October 31, 1989, the Lotspeiches began to arrange possible financing with ITT Capital.

Before this financing could be approved, Southern Aero sold S/N 2056 to another buyer. However, Southern Aero did have another Bell 204B "Super" available for purchase, S/N 2030, which was being refurbished after a crash. On January 3, 1990, Southern Aero faxed a specifications sheet to Crane for that helicopter, and the Lotspeiches proceeded to arrange financing for a possible purchase. In January, 1990, Steve and Linda Lotspeich made their first visit to Southern Aero's facility to examine S/N 2030. At trial, Steve Lotspeich discussed his first viewing of the helicopter in a state of repair:

> Q. Can you describe for the Court what the condition was of Serial Number 2030 and what you saw at Southern Aero and just sort of take us through what happened when you—from the time you arrived for the two days that you were there to the extent you can recall?
>
> A. We—well, I mean, we walked in the front door and of course, met with Ed Hendrickson [of Southern Aero] and I think we were introduced to Bill Williams

---

**12.** Paul Markowitz, the national aviation maintenance inspector for the U.S. Forest Service, explained at trial that an airframe and power plant mechanic's license

allows you to work on civil aircraft and to do maintenance on these aircraft and sign the log book that the work has been done. The airframe is one license. The power plant is another license. The airframe allows you to

work on the body of the aircraft. The power plant allows you to work on the engine of the aircraft.

**13.** An IA is a higher level of certification than an A & P. It allows a person to approve major repairs, to return an aircraft to service after an annual inspection, and to submit Form 337s with supporting data to the FAA for approval.

at the time. He—Ed walked us over to the hangar where the helicopter was and we started looking at it. The condition of the helicopter was obvious refurb. The floor was out of the helicopter, didn't have any doors or inspection panels or anything like that on it.

Q. You're talking about Serial Number 2030—

A. 2030, yes, uh-huh.

Q. —the helicopter you ultimately purchased.

A. Yes, yes. I mean, the data plate was on it, no windows, no seats. Some of the instruments were in but most of them weren't. There were lots of loose wires everywhere. You could see that they were rewiring the helicopter.

Q. Were you surprised by the condition of the helicopter that you had come to look at?

A. No, that's what they led me to believe it was going—they were going to do to it.

Q. Well, did that give you some concern that the doors were off, the seats were out, et cetera, the floors were out, wires were loose?

A. No, that was very encouraging.

Q. Why?

A. Because it's getting a thorough going over and a 30–year–old helicopter if you never opened it up like that, you wouldn't know what was going on in there. This one was getting thoroughly gone through.

Q. Well, did it make you suspicious that maybe this helicopter had been in an accident?

A. I didn't care what reason it was in that condition. If it had been in an accident or if they were just doing it because they were doing it, it didn't really matter to me. The fact was they were doing a thorough job because these were areas—I could see into areas of this helicopter that I would never see had it been assembled.

Q. Like what?

A. Well, I mean the whole floor was out of it, the whole thing was opened up, all the inspection panels. You could look through the whole aircraft and it didn't have any components on it so it didn't have any of that in the way, no engine, no transmission.

Q. Okay, when you say it didn't have any components on it—

A. Right.

Q. —can you give the Court and me an understanding of what you mean when you say it didn't have any components?

A. It didn't have an engine, didn't have transmission, so therefore, no rotor blades, no tail rotor assembly on it. It was just a bare airframe that was undergoing, you know, restoration.

Q. Did it have a tail boom on it?

A. It did have a tail boom.

Q. Did it have a forward cabin?

A. Yes, it did.

Q. Did it have a cockpit?

A. Yes.

Q. Okay, did it have the instrument panel in it?

A. Yes.

Q. Did it have cockpit seats?

A. No.

Q. Did it have a steering wheel or whatever it is you have?

A. Yes, it had a cyclic and a collective in it.

Q. And pedals and things like that?

A. Yes.

Q. Did it have the windows in it?

A. No.

Q. Any?

A. No windows.

Q. Did it have skid gear?

A. Not airworthy skid gear. It had some skid gear, some short things that they use to—when they're assembling airframes or moving them around and stuff.

Q. Did it have antennas and things on top of it?

A. Not yet.

Q. Okay, and you say it didn't have any doors on it?

A. No.

Q. Were the doors lying around next to it?

A. Yeah, the doors were up on a rack and there were—all the inspection panels and everything were stacked over on one side. You know, there were seats there. They weren't in it. In fact, they were—they were these metal bucket things that I really didn't like but they were there. I saw them and—

Q. Metal bucket things, seats?

A. Yeah.

As for the rest of the two days which the Lotspeiches spent at Southern Aero on their visit in January of 1990, they looked at maintenance and component records, talked to the owners of Southern Aero, and talked to the maintenance people working on the aircraft. Steve Lotspeich stated that:

We were given free reign to just roam around the facility there and talk to the different mechanics who were working on it. We spent time at the component overhaul shops. We spent time in the engine shop. We spent a good deal of time with Tom Miller and some of the other mechanics. I talked with some of the electricians. I talked with some of the avionics people. There were a few sheetmetal people around there that weren't working night shift that were working day shift.

There were several mechanics there that had maintained these helicopters in the field, and that's what I was primarily interested in. I didn't want an aircraft that the two of us couldn't maintain and operate in the field. I wanted a safe, dependable aircraft, and the way we wanted to operate was summers only and then work on it in the wintertime.

Crane Helicopters and Southern Aero executed a Sale/Purchase Agreement on January 11, 1990 for Bell Model 204B Serial Number 2030, and Crane agreed to pay $698,600.00.[14] Southern Aero agreed to finance $200,000.00 of the purchase price at a better interest rate than Crane was able to negotiate with ITT Capital. The willingness of Bill Williams and Southern Aero to finance $200,000.00 pleased Steve Lotspeich because "[Williams is] on the hook for $200,000 . . . it's an assurance that what they're selling me is what they're selling me because he's got a second position here to the finance company so if something goes wrong, he's out $200,-000." In addition, Southern Aero provided a written warranty covering the time period of the first 150 hours of operation or three months after delivery, whichever came first.

The Lotspeiches returned to Southern Aero in February of 1990, when the repair work on S/N 2030 had been completed. They inspected the helicopter, inspected the completed paperwork for the purchase, and checked to make sure that the majority of the card records of the components matched the components themselves. They did not look at old maintenance log books for the helicopter, but rather looked only at the most current log book which was presented to them at the time of purchase. Steve Lotspeich then performed solo test flights and test flights accompanied by Southern Aero's test pilot. According to Mr. Lotspeich, the helicopter exhibited "no problems," and performed "excellently." Crane Helicopters accepted delivery of S/N 2030.

During the purchase of S/N 2030, plaintiff applied to the FAA for a new registration number for the helicopter. On February 12, 1990, Crane Helicopters officially changed the registration number of S/N 2030 from N8514F to N109CH. As a result, Crane was required to apply for a replacement airworthiness certificate. The re-issuance of the

14. As to the finality of the agreement, it was Steve Lotspeich's understanding that the purchase would not be complete until Crane actually took delivery of the helicopter. His impression was stated in the following trial exchange:

Q. What was your arrangement with Southern Aero with respect to acceptance and delivery of the helicopter and final agreement to, you know, the completion of the sale? What was your understanding?

A. That it would be in the condition that they told us it was going to be in and that I agreed that that was the condition it was in and that I would test fly it and make sure that it flew properly before we finalized the sale. I mean, I'm agreeing to buy it if it turns out to be as they represented it's going to be. It's like ordering a car from the factory, you agree to buy it but they also are agreeing that it's going to be in the condition you're agreeing to buy it in.

airworthiness certificate was accomplished concurrently with a Part 135 (Commercial Operator) conformity inspection.[15] Ray Murphy, a principal operations inspector with the Oakland (California) Flight Standards District Office (FSDO) of the FAA, assisted FAA maintenance inspector Don Schoolcraft and an FAA avionics inspector in performing the conformity inspection of S/N 2030 at that time. They found that S/N 2030 met the type data certification sheet, meaning that it was a Bell 204B, and that there were minor errors in the helicopter's log books, and that there were no discrepancies with the component records. On May 3, 1990, Crane was officially certified by the FAA under 14 C.F.R. § 133 to carry external loads, under 14 C.F.R. § 135 as an air carrier/commercial operator, and under 14 C.F.R. § 137 to conduct agricultural operations. The FAA also reissued the airworthiness certificate with the new registration number, N109CH.

In May 1990, Crane bid on and was awarded its first firefighting contract with the United States Forest Service. The contract required the services of standard use and limited use helicopters, and certification of the operator under 14 C.F.R. §§ 133, 135 and 137. Prior to beginning work, S/N 2030 had to receive a certification—called an Interagency Fire Card—by passing a Forest Service inspection. Upon initially viewing S/N 2030, one of the Forest Service representatives who conducted the inspection, Paul Markowitz, stated to Mr. Lotspeich that he did not believe S/N 2030 was a 204B because it had ammunition chutes, and the skids did not fit properly. According to Markowitz, he told Lotspeich that Crane's helicopter had a UH–1 military airframe. Steve Lotspeich suggested that they discuss the matter with the FAA:

> I told him that if he knows something about it that I don't know, he should go to the FAA and I suggested that we should go together right there—right then. They were on the same field at Oakland Airport, but he wasn't inclined to do that and so he went ahead and did his inspection, his Forest Service inspection, and he told J.P. Johnston and Morgan Mills [other Forest Service representatives] that the helicopter was safe to fly and we went [and] flew it.

After the test ride, in which another of the Forest Service representatives, J.P. Johnston, noted that the helicopter performed satisfactorily, Lotspeich again raised his concerns with Markowitz about the latter's characterization of S/N 2030 as something other than a 204B. Lotspeich said to Markowitz:

> If you've got a problem with the helicopter, you know, I need to know that because it's still under warranty as a 204. I bought a 204, the FAA's got it registered as a 204. It's got an airworthiness certificate for a 204. The data plate says it's a 204. It's been signed off by a repair station as a 204. It's on a 135 certificate as a 204. If you know something the rest of us don't, you need to tell the FAA.

Markowitz declined the invitation to discuss the matter with the FAA at that point, and did not issue the Interagency Fire Card because of "discrepancies" with the helicopter.[16] These discrepancies related to equip-

---

15. William Reichardt, an FAA Aviation Safety Inspector, described the inspection which takes place for issuance of an airworthiness certificate. He said that the inspector examines the aircraft's records to make sure the operator has complied with all the FAA airworthiness directives. The inspector then makes sure that all installed components are approved by the type certificate data sheet, and that the aircraft is in an airworthy condition as stated by a United States-certified mechanic. After these steps,

> the inspector would go out and look at the aircraft. Basically it is an external inspection only, we don't open any panels and do [an] internal inspection. If anything we would confirm the engine, make, model, or propeller, or whatever by having the cowling opened up or

something of that nature to confirm, read the numbers off the data plates, confirm that the aircraft had a data plate, and then issue an airworthiness certificate.

Reichardt noted that more is involved in a full conformity inspection than in an inspection for an airworthiness certificate. He stated that a "[f]ull conformity inspection would be also removing panels and everything, and looking the aircraft completely over to make sure that it met the type design."

16. The Forest Service discrepancy report for the 1990 inspection does not indicate any concerns regarding S/N 2030's paperwork or its physical conformity to the type certificate, in fact the line for aircraft type was filled in by Markowitz as "204B."

ment which was malfunctioning or insufficient for the Forest Service contract, and they were corrected by Crane within the following two weeks. At some point during that time period, Markowitz discussed with Ray Murphy of the FAA the larger issue of whether S/N 2030 was a 204B. Steve Lotspeich asked Murphy about the matter, and, according to Lotspeich, Murphy informed him that "[the FAA had] cleared this up, that they told [Markowitz] that everything was fine with the helicopter." Shortly thereafter, Crane received the Interagency Fire Card by mail.[17] In 1991 and 1992, S/N 2030 was similarly inspected by the Forest Service. It received Interagency Fire Cards each year and the inspectors listed no discrepancies with respect to the helicopter's physical conformity to type certificate.

In 1993, the Forest Service encountered problems with two other 204B helicopters not owned by Crane Helicopters. One helicopter crashed, and there were questions about the history of the other's component parts. As a result of concerns which arose from these incidents, the Forest Service conducted special conformity inspections of all 204Bs which were then under contract to the Forest Service. After Steve Lotspeich became aware that an inspection was to take place, he arranged for Bob Pearson, a Bell technical representative, and Scott Meyers, Crane's Principal Maintenance Inspector out of the Oakland FSDO of the FAA, to participate along with Mr. Markowitz. Lotspeich's rationale was that "these questions had been flying around and if there were unapproved parts on my helicopter I wanted them documented by Bell and the FAA. . . ." No dis-

crepancies were found in the inspection, and Markowitz issued S/N 2030's 1993 Interagency Fire Card to Crane shortly thereafter.[18]

In 1994, Crane faced more questions about the helicopter's origins. In February of 1994, James Burt III, Bell Helicopter's Chief Counsel for Product Integrity, wrote an article in the January/February issue of Bell's customer newsletter, "Rotorbreeze." A portion of the piece read:

Did You Know That. . .

1. It is a violation of FAR § 43.3 for any person, firm, or corporation other than the original manufacturer to rebuild any aircraft?

2. It is a violation of FAR § 45.13 for any person to install a data or identification plate on any aircraft, aircraft engine, rotor component, rotor blade, or rotor hub other than the one from which it was removed?

3. Persons, firms, or corporations which misidentify an aircraft rebuilt or remanufactured by someone other than the original manufacturer as an aircraft built or manufactured by that original manufacturer may be subject to civil suit for damages, injunction, seizure or destruction of the subject aircraft, or criminal prosecution with penalties up to 15 years in prison and $5,000,000 in fines?

* * *

All of the items are true. Unfortunately, the FAA has not given us much in the way of a definition of remanufacturing or rebuilding. You can assume, however, that if an aircraft has been largely consumed by

---

17. Steve Lotspeich stated at trial that he re-examined S/N 2030 at this time and found no ammo chutes. As far as the ill-fitting skid gear, Lotspeich noted that

> there's a kit for putting the high skids on and the only cross tubes you can buy are for a [Bell Model] 205 and that's why they don't fit right. They're the only ones for sale and you have to modify the [underside] of the aircraft to accept the skids. They're a bigger diameter and it's a Bell technical bulletin that tells you how to do it . . . for a 204.

Lotspeich stated that he was able to verify with the FAA the propriety of using this high skid gear.

18. Markowitz provided the following testimony at trial:

> Q. Nevertheless, you did a very detailed conformity inspection of the entire fleet of 204B's in 1993, as you testified yesterday, correct?
> A. Yes, sir.
> Q. As you testified, four our of the five 204B's that you inspected in that detailed conformity inspection in 1993, four out of five of those helicopters were considered fine and were carded and approved for operation in 1993, correct?
> A. Yes, sir.
> Q. Crane Helicopter's only helicopter was one of the four that was okayed and carded in 1993?
> A. Yes, sir.

fire, fragmented into multiple small pieces by an impact, or structurally damaged in such a way as to *require replacement or reconstruction of multiple major subassemblies according to the pertinent structural repair manual, the aircraft is being "rebuilt"*, and not just repaired. Likewise, if you take a commercial data plate and place it on a military surplus part or ship, you are violating FAR § 45.13. *The issuance of a Certificate of Airworthiness by the FAA does not change these facts.* Bell Helicopter Textron is in the process of reviewing its records and those of official agencies to identify destroyed aircraft and may delete these from its Type Certificate Data Sheet and from its publications subscription list. If you are concerned to know whether your helicopter might have been destroyed at some prior time, please contact Bell Product Support.

(Emphasis in original.)

Burt's article caused Steve Lotspeich to be concerned about his helicopter's value because, in Lotspeich's words, "until you clear [the issue] up, your helicopter is next to worthless because anybody that gets [the bulletin] is going to say, 'Well, until we know that that helicopter is not going to get removed from the type certificate data sheet, we're not interested in buying it.' "[19] Lotspeich called the Bell product support department, which informed him that twenty-five helicopters were going to be removed from their respective type certificate data sheets, and that there were two 204Bs that were possibilities for removal. Serial Number 2030 was one of those two helicopters because it had been in a prior accident. Bell

agreed to send representatives to inspect the helicopter.

On February 15, 1994, two Bell technical representatives, Bob Pearson and Bob Gustafson, inspected S/N 2030 at the maintenance facility which Crane used, Big Valley Aviation in Stockton, California. Mr. Lotspeich encouraged free access to his helicopter so he could find out "what this was all about." According to Steve Lotspeich, Gustafson informed him after the inspection that everything was fine and that they had a "perfectly legitimate 204."[20] Bell Helicopter decided to send Tony Stier, a Product Service Engineer, to perform another inspection. Stier conducted his inspection of Crane's helicopter on February 19, 1994, at Big Valley Aviation. At trial, Stier stated that he examined the helicopter's log books and component records,[21] and he then inspected the helicopter. According to Stier, he determined that S/N 2030 was not a Bell 204B, and, communicated his conclusions to both Mr. and Mrs. Lotspeich.

At trial, Stier identified several alleged problems with S/N 2030 that led to his conclusion. He felt it would not have been economically feasible to repair the helicopter from its condition depicted in NTSB photos of the 1988 crash in Alabama. Stier also was concerned that the helicopter had many "military" parts, and that Crane's records only stated the time of the last overhaul of many of the component parts, rather than those parts' entire history. Tony Stier also felt that S/N 2030 should have had structures to support passenger steps, which are peculiar to the Model 204B and were never installed on military UH–1 Series helicopters, even though the steps were no longer installed on

---

**19.** The type certificate data sheet for a particular model of aircraft lists all the serial numbers of conforming aircraft.

**20.** At trial, Bob Gustafson gave the following testimony:

> Q. At the conclusion of your inspection of the Crane helicopter that you discussed earlier, did you formulate an opinion that Mr. and Mrs. Lotspeich did not own a commercial Bell 204B helicopter?
> A. I did not.
>     *    *    *    *    *    *
> Q. At the conclusion of your inspection of the Crane helicopter, did you inform Bell Heli-

> copter that you could not make a determination that the Lotspeiches' helicopter was not a Bell 204B?
> A. I informed [them] that I could not.

**21.** This conflicts with Steve Lotspeich's testimony that Stier did not look at the records. Lotspeich stated that he would have had to retrieve the log books and component records from an office if Stier had wanted to see them.

the helicopter at issue. Last, he mentioned to the Lotspeiches that "the main beams of the aircraft did not look typical to 204B."

After Stier explained these discrepancies to the Lotspeiches, Steve Lotspeich testified that he invited Stier to discuss the allegations with the FAA:

I said, "Is there anything on here that we need to go to the FAA with." I said, "You know, you've written these notes." I said, "We can call the FAA. I've got my car here. We can drive over, we can talk to them and you can explain all this or if you think they need to look at the helicopter, we can call them and they can come over here and you can tell them your concerns."

And he says, "Well, no, it's really not a concern for the FAA. I wouldn't be concerned. The FAA has approved your helicopter. The Forest Service has approved your helicopter." He said, "I'd just go on about my business if I were you." . . .

According to Lotspeich, Stier informed him that Bell was not going to remove S/N 2030 from the type certificate data sheet, and, in fact, could not because such an action was up to the FAA and the NTSB. Stier said that he was not planning on writing a formal report of the inspection, and any report he wrote would just be a "recap" of the handwritten notes which he had taken and which he left with Crane upon his departure. Therefore, when a Bell representative called a few days later asking if the Lotspeiches wanted a further report from Stier, Steve Lotspeich testified that he declined the offer. Steve Lotspeich confirmed this with a facsimile to Bell. At trial, Lotspeich stated that "as far as I was concerned the issue [that started with the Rotorbreeze article] was over with now. My helicopter was . . . going to stay on the type certificate data sheet."

Five months later, however, on July 22, 1994, James Burt of Bell Helicopters rekindled the debate with a facsimile message to Paul Markowitz. The text of the fax read:

Paul: It has come to my attention that Crane Helicopter Services has a Forest Service contract for [S/N 2030]. The original Bell aircraft of that serial number was reported lost in Laos in 1967 while flying

for Air America. Be advised that said aircraft was destroyed (again) 1/28/88 5 miles west of Stockton, Alabama. The Crane aircraft was inspected a few months ago by a Bell representative and determined to be something other than a Bell 204B, probably military in origin. The data plate, at the time of that inspection, was screwed, rather than riveted, onto the airframe. Please let me know what the Forest Service intends to do with regard to this aircraft.—Jim

Crane did not receive a copy of this facsimile and was unaware of its existence until after the litigation was initiated.

Approximately one year later, in a letter dated August 25, 1995, the Forest Service suspended Crane from ferrying firefighting personnel, which was one aspect of their Forest Service fire suppression contract. The contracting officer, Richard Willis, wrote to the plaintiff and informed Steve and Linda Lotspeich that "effective immediately Crane Helicopter Services shall cease the conveyance of Government personnel in Helicopter N109CH." Willis stated that "[t]his partial suspension is due to preliminary findings of the mutually agreed upon conformity inspection that the aircraft may not meet contract specifications." The suspension was to remain effective for ninety days unless the matter was resolved sooner. Steve Lotspeich explained this development and Crane's reaction:

[I]n 1995 Mr. Willis sent us a letter restricting us from carrying passengers with the helicopter while we were on contract in Wenatchee, Washington . . . and when the three remaining days of the contract were finished, we flew the helicopter, . . . parked in behind the Oakland FSDO and I talked to [the Forest Service] on the phone.

And I told them that we were bringing the helicopter there. That somehow I wanted to get this put behind us, that every year there's some new allegation from the Forest Service that there's something wrong with our helicopter. Every time that we go to the FAA, the FAA tells them that it's not and I'm caught in the

middle of it and I'm sick and tired of being in the middle of it. . . .

At Lotspeich's urging, the FAA arranged a meeting to discuss the matter at the FAA's FSDO in Oakland. Among those present at this August 30, 1995 meeting were Mr. and Mrs. Lotspeich; plaintiff's relief pilot; the Lotspeiches' attorney; Paul Markowitz of the Forest Service; Thomas D. Tesseny, an aviation safety inspector for the FAA at the Oakland FSDO; and Paul McKenzie, the director of maintenance at Big Valley Aviation. At the meeting, Markowitz informed Tesseny of his opinion that S/N 2030 was "not a genuine civil aircraft." No inspection of the aircraft was performed at that time, but Markowitz agreed to prepare a written report for the FAA substantiating his allegations. Markowitz sent this report (which had been received by Mr. Willis and J.P. Johnston of the Forest Service) in the form of a letter to Tom Tesseny dated October 10, 1995.[22] Markowitz began his letter by stating that "[f]or quite some time, the U.S. Forest Service has had some concern over the air worthiness certificates issued to some Bell 204B Helicopters under contract to us for use in wildfire suppression." Markowitz then proceeded to describe two crashes of Bell 204Bs with unapproved parts which had occurred during prior years. He continued:

> Now the U.S. Forest Service has concerns relating to a Bell 204B, Serial Number 2030, FAA registration number 109CH. This aircraft is currently under contract to us and is owned by Crane Helicopters located in Alamo, CA. It has a current air worthiness certificate issued by the FAA. Since issuance of the air worthiness certificate, additional information has come to light that has led us to believe that this aircraft may not be a Bell 204B, rather it appears to be a UH–1 modified with a Bell 204B tail boom and other 204B parts, coupled with other cosmetic changes to make it appear to be a commercial 204B. Questionable items include the fit of the aft cross tubes. On a commercial 204B the cross tubes fit into the cross tube tunnel. The cross tubes on 109CH do not fit into the tunnel and the skid caps have been shimmed [ ] 1″ or so to accommodate the cross tubes. The cabin door latch inside the door post doesn't have the back up plates normally associated with a commercial 204B. The nose compartment configuration is not consistent with the aircraft serial number and there are some obviously missing structural members under the floor as evident by missing step supports. These examples are a few of the more obvious discrepancies that have been noted in the course of inspecting 109CH. We suspect that more discrepancies will be found upon an in-depth inspection by FAA personnel.

> A short history of 109CH may be in order. According to an attorney representing Crane Helicopters, FAA records indicate Bell 204B, Serial Number 2030, was sold by Bell Helicopters on September 8, 1965. It was subsequently shipped to Greenland and then to Canada then back to the United States. The aircraft was in a 1988 crash and was repaired by Southern Aero Inc. of Ozark, AL. In 1990, Southern Aero sold a helicopter bearing Serial Number 2030 to Crane Helicopters who apparently transported the aircraft to Oakland, CA where the Oakland FSDO certificated the aircraft in the standard category.

> A history of the aircraft maintained by Bell Helicopters appears to be different. According to Bell Helicopter records, the Bell 204B, Serial Number 2030 was originally sold to Air America where it was subsequently listed as lost in Laos in 1967. The Data Plate for the Air America aircraft next appears on an aircraft that was completely destroyed in an accident near Stockton, Alabama in 1988 (NTSB Accident Report No. ATL88FA085 dated 8–17–88). In addition to the above, we have a recent note in our files from Mr. James L. Burt III of Bell Helicopters stating that ". . . . the Crane Helicopter was inspected a few months ago by a Bell Representative and determined to be something other than a Bell 204B, probably military in origin." Recently at the request of the Justice Department and in concurrence with Crane Helicopters, we had an individual

---

**22.** Crane Helicopter Services also received a copy of Markowitz's letter from the FAA.

familiar with both the Bell 204B and UH–1 Series aircraft review photos of various components and modifications existing on the Crane aircraft. After reviewing the photos he has rendered a preliminary opinion that while some components on the aircraft correspond to a commercial 204B, other parts are peculiar to a UH–1 Series aircraft.

The accumulation of information we have obtained when viewed in total has led us to question the authenticity of the aircraft in question. Given the tragic consequences we have related concerning [two unrelated aircraft,] we recommend FAA engineers visit the Bell facility and examine any as-built drawings, specifications and other data including the aircraft history on file with Bell to see if the information corresponds to the aircraft currently bearing the Data Plate originally issued to Serial Number 2030. Mr. Tony Stier of Bell Helicopters ... has indicated he would be available to work with the FAA Engineering Branch concerning the structural differences in the air frame of the commercial Bell 204 and those that appear to exist on 109CH. We further recommend that a document search be done of FAA records in Oklahoma City to determine if FAA records pertaining [to] the Crane aircraft match the Bell records for the same serial number.

In response to Markowitz's letter, Tom Tesseny, an aviation safety inspector for the FAA at the Oakland FSDO, inspected S/N 2030 on two separate occasions, December 7, 1995 and January 25, 1996. He was assisted by Paul McKenzie, the director of maintenance at Big Valley Aviation. Prior to conducting the inspection, Tesseny asked for and received a list of differences between the 204B and its military counterpart UH–1 series from the FAA Rotorcraft Director. In addition to examining the helicopter, Tesseny reviewed the log books and component records for the aircraft, and compared them by part number and serial number to the actual components on the aircraft, and he also reviewed the FAA's file on S/N 2030 going back to the "birth" of the aircraft in 1965. As a result of the inspection and review, Tesseny found no problems with the records and physical condition of S/N 2030.

On January 26, 1996, Tesseny wrote a letter to Markowitz, a copy of which he also provided to plaintiff, and responded specifically to each of the issues raised by Markowitz's letter. In pertinent part, Tesseny wrote:

[On] the subject of the helicopter skid cross tubes we have found that sometime before the purchase of N109CH by Crane Helicopter[ ] Services the aircraft was modified with the installation of a High Skid Gear Kit. This installation has been verified in a Technical Bulletin from Bell Helicopters Textron, bulletin number 204–80–16. The shim installation has been accomplished in accordance with that bulletin to facilitate the installation of the High Skid Gear Kit. Big Valley Aviation, Inc. a Federal Aviation Regulation, (FAR) Part 145 Repair Station with the appropriate ratings has verified the installation of this kit to be authentic and recordation of the modification is ongoing with this office. The cabin door latch in the helicopter cabin appears to match the Illustrated Parts Breakdown Manual dated 12–01–78, Rev. 3 dated 03–03–89 for the Bell 204B for serial number 2030. For serial number 2025 and subsequent the doors incorporate an approved emergency exit which N109CH has. The nose compartment also appears to match the Illustrated Parts Breakdown Manual for the Bell 204B, serial number 2030 under "ballast installation". This nose compartment area has been modified for the installation of a second aircraft battery. That installation has been approved by this office and the maintenance records reflect the modification.

The helicopter was extensively repaired after the crash of 1988 by an FAR, Part 145 Repair Station with the appropriate ratings. During that repair and well before the purchase of N109CH by Crane Helicopters Services, apparently the structural members for the outside steps were not installed under the floor along with the obvious steps themselves. Since the purchase of N109CH, Crane Helicopters Services and their repair facility, Big Valley

Aviation, Inc. have tried to order the appropriate step assemblies to install on the helicopter but have not been successful in obtaining those assemblies due to the rarity and unavailability of the assemblies themselves and all attaching parts. This office will work with Crane Helicopters Services and Big Valley Aviation, Inc. in the approval of either the installation or removal of the step assemblies.[23] It appears that the [absence] of the structure for the steps that [is] normally installed under the main cabin floor [does] not [affect] the structural integrity of the helicopter cabin section.

Since the purchase of N109CH and the certification of Crane Helicopter Services in 1990 this helicopter has been operated and maintained in accordance with all appropriate manufacturer maintenance requirements and all appropriate Part 135 Federal Aviation Regulations. The historical maintenance records appear to be in order. All entries indicate inspections and maintenance performed, repairs or alterations accomplished, Airworthiness Directives [24] complied with and life limited component cards for all appropriate parts installed on the helicopter.

(Footnotes added.)

In November of 1995, after Markowitz sent his letter, but prior to Tesseny's inspections, S/N 2030 was inspected at the request of someone other than Crane, Bell, the FAA, or the Forest Service. The United States Department of Justice asked Frederic Wilken, an Aircraft Accident Reconstruction Consultant to review whether or not Crane's helicopter was "authentic." Wilken, assisted by Markowitz, spent two days inspecting S/N 2030 on November 22 and 24, 1995. Wilken prepared for his inspection by reviewing S/N

2030's FAA aircraft certification file, the accident investigation reports from its 1988 crash, and Canadian and Danish aviation records concerning the aircraft. He discussed with Bell engineers the history of the 204B model, its certification requirements, and differences between the civil 204B model and similar military models. Wilken studied the aircraft flight manuals and parts manuals for the 204B and other helicopter models, and he interviewed several people involved with S/N 2030, including Tony Stier, Paul Markowitz and Rick Willis. He also reviewed numerous depositions and other data produced or filed as exhibits, and inspected other helicopters, including one identified as a 204B and one identified as a UH–1F.

Eight months later, on July 17, 1996, Wilken issued a Report of Findings with respect to his investigation of S/N 2030's authenticity. The Report's conclusion states:

> The commercial helicopter owned and operated by Crane Helicopter bearing serial number 2030 is not a commercial Bell 204–B Series Helicopter as defined by Bell Helicopter's engineering drawings.
>
> The helicopter is comprised of a combination of military and commercial parts and components. Accordingly, the aircraft cannot be classified as a military UH–1 Series Helicopter or a commercial Bell 204–B Series Helicopter. The main fuselage structure as defined by the engineering blueprints does not conform to a commercial Bell 204–B Series Helicopter.
>
> Crane Helicopter and Southern Aero Corporation had knowledge that Bell Helicopter Model 204–B, serial number 2030 was a counterfeit helicopter and not eligible for a Federal Aviation Administration Standard Airworthiness Certificate. Despite this knowledge, Mr. Lotspeich represented to

---

**23.** On February 20, 1996, subsequent to the writing of this letter, Tesseny executed an FAA Form 337 which gave FAA approval for the operation of S/N 2030 without the step support brackets. Conversations between Tesseny, Paul McKenzie of Big Valley Aviation, and Bell Helicopter had led all concerned to the conclusion that the steps, and, thus, the step support brackets, were nonessential to the aircraft.

**24.** Airworthiness Directives are issued by the FAA when an unsafe condition exists in an air-

craft or component and that condition is likely to exist or develop in other aircraft or components of the same type or design. *See Commander Properties, Inc. v. Federal Aviation Administration*, 11 F.3d 204, 205 n. 1 (D.C.Cir.1993) (citing 14 C.F.R. § 39.1). Directives are issued in conjunction with the FAA's continuing review of the airworthiness of aircraft, and no aircraft or component subject to an airworthiness directive can be used until the Directive is satisfied. *Id.* (citing 14 C.F.R. § 39.3).

the U.S. Forest Service that his aircraft serial number 2030 was properly in compliance with all pertinent United States regulations. Due to the helicopter's improper airworthiness status, Mr. Lotspeich misrepresented the aircraft and improperly secured several U.S. Forest Service contracts.

The Report then continued by giving a summary of the support for Wilken's conclusion. He alleged that there were several discrepancies with the helicopter's records. First, Southern Aero had "installed many new and overhauled military surplus components without supplying the required military historical documents supporting the components['] airworthy status." Second, S/N 2030's log books did not properly document "rebuilding" which was required after the 1988 accident in Alabama.

Next, Wilken's Report of Findings referred to specific parts of the Crane helicopter which allegedly did not conform to the engineering drawings for a commercial model 204B. First, with respect to the cabin steps and the step support structures, Wilken stated that:

> The absence of cabin steps, in itself is not significant, because many commercial Bell 204–B Series Helicopter operators choose to remove the steps. However, the absence of the structural support for the steps or any evidence of reworking to remove the structural supports is significant because all commercial model 204's of this series possessed the support structure.... The steps and support structures are not found on military UH–1 Series Helicopters.

Second, Wilken believed that modification of the door posts reflected an attempt to make the helicopter "appear" to be a commercial 204–B. His report stated:

> Information regarding the cabin door assembly for this serial number helicopter reflects a Type Design of a dual latch located at the top and bottom of each cabin door. Conversely, the military model UH–1 utilizes a single latching system located at the center of the door and door post. The Crane Helicopter N109CH, serial number 2030 had been modified to accom-

modate the dual door latching system. Crane's dual point door latch is consistent with an airframe of a commercial Bell 204B Series Helicopter. However, the single center point latch system on both door posts had been concealed. The left door post had been modified to cover the center latch hole with sheet metal. The right side cabin door post had been modified to cover the center latch hole with the use of rubber trim and masking tape. This modification and the attempt to hide the center hole clearly proves that there was an attempt to conceal the fact that this helicopter was changed to appear to be a commercial Bell 204–B Series Helicopter....

Third, repeating a criticism stated on the first page of the Report's conclusion, Wilken attacked what he considered to be the improper use of a military part on S/N 2030—a thin-walled mast pole. Wilken claimed that there were no historical records for this part, and, therefore, S/N 2030 could not be considered airworthy because it had an uncertain history. Finally, Wilken restated his conclusion at the end of the "Interviews" section of his report, alluding to the fact that Steve Lotspeich was aware of the "inauthenticity" of his helicopter:

> The aircraft's data plate does not match the helicopter identified as a commercial Bell 204–B Series Helicopter bearing serial number 2030. This helicopter was assembled using military parts and components of unknown or questionable origin. When a prospective buyer conducts a prepurchase inspection of this helicopter, it is not difficult to determine that this helicopter cannot possibly be an authentic commercial Bell 204–B Series Helicopter. If a person or company does not have the capability to determine the status of the helicopter, he should call upon a person with appropriate expertise. It is common industry knowledge that the commercial Bell 204–B and 205 Series Helicopters are being counterfeited by disreputable companies in the United States....

Mr. Wilken also concluded that "[i]t was the responsibility of both Southern Aero Corporation and Crane Helicopter to secure and transfer the documents which provided his-

torical verification of component times. Without this documentation, the aircraft would be considered unairworthy."

In the same time frame during which Wilken was preparing his Report of Findings, from November of 1995 through the summer of 1996, Crane first consulted its expert in helicopter-related matters, George Powell. Powell, at the time of trial, owned a firm called Powell of Paoli which advised clients on matters of manufacturing and quality control with respect to FAA-approved products. On July 14, 1996, Powell issued his initial expert report to the Lotspeiches, examining the configuration and airworthiness of S/N 2030. The report reads:

> This is a report on Bell Helicopter 204B S/N 2030, FAA Registry "N109CH", owned and operated by Crane Helicopter Services Inc. of Alamo, California. It was prompted by the declaration of James Burt, (Bell Helicopter's Chief Attorney–Product Integrity), to the United States Forest Service, (USFS) that S/N 2030 was "Lost in Laos", and that the Crane Helicopter was "something other than a 204B, probably military in origin." ...
>
> At your request to investigate this charge, which you believe prompted your USFS contract cancellation, I met with you December 11, 12, 1995, and again January 25, 26, 1996. We reviewed the helicopter and its history of ownership, airworthiness, operation, repair, and maintenance. I observed that Crane has thoroughly documented the history of helicopter S/N 2030 and possesses originals or copies of related documents. The helicopter was manufactured in 1965. It has accumulated approximately 17,800 hours during which time it has been repaired by FAA Repair Stations following an accident in 1988 and again in 1994. Crane purchased the helicopter in 1990 from Southern Aero, then an FAA Repair Station.
>
> Since 1990, the helicopter has flown 1500 hours and has been maintained by Big Valley Aviation, a Bell Customer Service Facility for 20 years, (and an FAA Part 145 Repair Station) in Stockton California. We met with Big Valley also on December 11, & 12, 1995, to perform a joint review of the aircraft and records. The key Big Valley personnel involved were Ray Etcheverry, General Manager, and Paul McKenzie, Director of Maintenance.
>
> The required records were transferred to Crane, with the helicopter, by the previous owner, Southern Aero. Records are in accord with FAR Part 91.417(a)(2) as stated in 91.419(a).... They meet also the requirements of FAR Part 43, Appendix B....
>
> All required AD's (FAA Airworthiness Directives), and Manufacturer's ASB's (Alert Service Bulletins), had been complied with. Applicable maintenance schedules had been met with required inspections, overhauls, and retirements.
>
> We observed that certain parts (including some in the dynamic system), were manufactured for the Military by Bell under its single standard (MIL and CIVIL) quality system. These common parts have the same part number on both the MIL and CIVIL configurations (UH–1B and 204B). They have been inspected and overhauled in accord with Bell Civil Maintenance Manuals, and FAA requirements. The FAA has always considered such MIL–CIVIL parts as "approved", provided they are in condition for safe operation. FAA Advisory Circular AC20–62D ... is the current FAA publication to so indicate. Installation and approval of such parts by Big Valley was made under the FAA Repair Station Authority.
>
> The most important parts for the function of an aircraft are usually serialized as a part of the design requirements. Crane has provided a complete listing of all the serialized parts on Helicopter 2030.... The part numbers installed are authorized in the publications referenced, and are maintained properly by Big Valley. The engine, SIN LE07515 is a Lycoming T–53–13B, a higher powered engine than the T53–11 of the 1965 delivered configuration. It is installed per STC, (Supplement Type Certificate). The skid gear is a higher configuration installed per Bell Tech Bulletin 204–80–16.
>
> On December 12, 1995, we met at Big Valley with Tom Tesseny, FAA Oakland

FSDO, (Flight Standards District Office). He has made a special review of 2030 in view of USFS concerns. He advises that Helicopter 2030 is a conforming Bell 204B and, has so reported to the USFS, by letter dated 1–26–96. In it he addresses their concerns. . . .

Major differences of a 204B compared to a (Military) UH–1B are readily apparent. Required differences were all present on 2030. I list a few key ones for a 204B:

Longer Main rotor blades (4′ longer)

Longer Tail Boom and with Baggage Compartment

An Engine Fire Extinguishing System

Cabin Doors with Emergency Exits

242 Gallon Fuel Cell and Filler Cap ABOVE Engine Deck

Heavier Wall Skid Tubes

10 Minute Low Fuel Warning

FAA Certification

The USFS has questioned the lack of the original style 204B passenger step and attaching fittings. They were never available as spares and were not incorporated during the Southern Aero repair following the 1988 accident. Crane Helicopter has incorporated a longer more functional step via an FAA Form 337 (Major Repair and Alteration).

I did find a non-conformity: There is no mounted inertia flashlight in the cabin. Crane is taking corrective action.

On July 1, 1996, for comparative purposes, I inspected a UH–1B (Bell S/N 946) which was made available by Westwind Helicopters of Sacramento, CA. This provided assurance that the visible differences between Crane's conforming 204B and a surplus military UH–1B are striking.

Despite the findings and assurance by me, the FAA, and Big Valley Aviation, Crane contracts with USFS and CDF (California Dept. of Forestry), are now not possible. The aircraft remains under suspicion, "until resolution is reached" by Bell and USFS. . . .

My resume of experience is attached as Encl. 5. From this background, and the foregoing investigations, I draw the conclusion that Helicopter SIN 2030 is a genuine Bell 204B in an approved, properly altered and maintained airworthy configuration. The name plate appears genuine and is properly located and installed. Helicopter 204B 2030 has a current FAA airworthiness certificate and registration. Crane Helicopter is approved for operation under FAR § 135. . . .

## DISCUSSION

The court enjoys the benefit of a considerable record, created during the course of the trial on the government's counter-claim. An extensive collection of exhibits, testimony adduced from witnesses representing Crane Helicopter Services, Big Valley Aviation, the Forest Service and the FAA, and additional testimony of expert witnesses on behalf of both parties allows the court to make the factual and credibility determinations required to resolve the questions presented.

The dispute in this case revolves around the government's allegation that plaintiff/counter-defendant, Crane Helicopter Services, has falsely represented to the Forest Service that Crane's helicopter is a commercial model Bell 204B "Super." Defendant contends that Crane's helicopter is actually a military model of the UH–1 series, and, because it is something other than a 204B, it was offered and used in violation of Crane's forest fire suppression contracts with the Forest Service. Further, defendant asserts that Crane knew or should have been aware that it was perpetrating a fraud. While the parties dispute the extent to which fraud of this nature is committed in the helicopter industry, the "History" section of defendant's expert's Report of Findings adequately summarizes the larger issues surrounding the debate in this case:

During the 1960's and 1970's, Bell Helicopter produced several military models of helicopters identified as the UH–1 Series Helicopter. They were designed to U.S. Military specifications and requirements. The military established the service life and overhaul requirements for all component parts. The military dictated the procedures that would be followed while maintaining the airworthiness of the helicopter.

When Bell Helicopter manufactured the commercial Bell 204–B Series Helicopter and it was offered for commercial use, Bell was required to submit the design details along with service requirements to the Federal Aviation Administration ("FAA") for approval. After FAA review and validation, a Type Certificate was issued which allowed the helicopter to operate commercially and carry passengers. The military UH–1 Series Helicopters have not received Federal Aviation Administration review or approval to carry passengers. The UH–1 Series Helicopters are certified in a restricted category and are not considered safe to carry passengers by Federal Aviation Administration standards.

The Federal Aviation Administration has regulations for certifying aircraft for commercial use. The regulations are identified at 14 CFR Part 21 "Certification Procedures for Products and Parts". [They] provide[ ] procedural requirements for the issuance of Type Certificates. In the case of the UH–1 Series Helicopter, the Federal Aviation Administration ... does not allow for the transportation of passengers. Because of the different treatment of UH–1 and Bell 204–B Series Helicopter[s] by the FAA, individuals and companies have attempted to modify the UH–1 Series Helicopter to resemble a commercial Bell 204–B Series Helicopter. In addition, when a commercial Bell 204–B Series Helicopter is damaged beyond cost effective repair, major UH–1 Series Helicopter airframe components are used as uncertified replacements. This would include tail booms and the entire fuselage. The helicopter's data plate is removed from the wrecked helicopter and reinstalled on the modified military airframe. The company or individual modifies the airframe of the helicopter to hide the obvious differences and resells it as the original commercial Bell 204–B Series Helicopter that crashed.

The trial before the court was held to address the United States' counterclaims under the Special Plea in Fraud, 28 U.S.C. § 2514; the False Claims Act, 31 U.S.C. § 3729; and the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604.[25] Prior to addressing each of the legal theories invoked by the government, the court notes that the legislative history of the Contract Disputes Act states that the available remedies should be considered cumulative and not in the alternative. Specifically, the congressional report explaining the antifraud provision of the Contract Disputes Act states in relevant part:

> This provision is intended to be separate and distinct from the rights now possessed by the Government in legislation such as the False Claims Act, 31 U.S.C. [§ ] 231 *et seq.*, or the Forfeiture Statute, 28 U.S.C.

---

**25.** Although the defendant raised in its fraud counterclaim a theory of common law fraud, defendant did not further address, and, thus, abandoned the concept at trial. In any event, a separate theory of common law fraud, even if cognizable, does not advance the defendant's case. The United States Court of Appeals for the Federal Circuit noted the elements of common law fraud in *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985):(1) misrepresentation of a material fact; (2) intent to deceive; (3) justifiable reliance on the misrepresentation by the party deceived; and (4) injury to the party deceived, resulting from reliance on the misrepresentation. An earlier line of cases, *see BMY–Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed.Cl. 109, 128 (1997); *Colorado State Bank of Walsh v. United States*, 18 Cl.Ct. 611, 628–29, 1989 WL 139113 (1989), *aff'd*, 904 F.2d 45, 1990 WL 62180 (Fed. Cir.1990) (Table), applies all four elements of common law fraud as a prerequisite to establishing a Special Plea in Fraud under 28 U.S.C. § 2514, such that the elements of common law fraud would be coextensive with the elements of a Special Plea in Fraud. Another more recent line of cases in the United States Court of Appeals for the Federal Circuit, *see Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed.Cir.1994) (citing *McCarthy v. United States*, 229 Ct.Cl. 361, 670 F.2d 996, 1004 (1982)), *see also Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed.Cir.1998), requires only the first two elements of common law fraud—knowledge that a claim is false, and the intent to deceive the government by submitting the claim—for liability under the Special Plea in Fraud statute. Under these latter cases, common law fraud would be more difficult to prove than a Special Plea in Fraud. In this case, had defendant pursued common law fraud, because defendant cannot prevail under the Special Plea in Fraud statute, the defendant logically also would not make out a case of fraud under the more difficult standard required for common law fraud.

[§ ] 2514. That is, section 4(b) [the anti-fraud provision, codified at 41 U.S.C. § 604] is not intended in any way to diminish the rights now afforded to the Government under current legislation. . . . Section 4(b) will afford the Government a separate and additional remedy of recovering an amount equal to the fraudulent or misrepresented amount.

S.Rep. No. 95–1118, at 20 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235.

In the case at bar, the government invokes the Special Plea in Fraud, pursuant to 28 U.S.C. § 2514, as a defense to the claims contained in Crane's complaint. The statute in question, 28 U.S.C. § 2514, reads:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514. This court finds the mandate of the words employed in 28 U.S.C. § 2514 to be clear and unequivocal. The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during contract performance or in the making of a claim.

There is no suggestion in the statute that a contract can be divided up into performance sectors to allow payment of some claims on a corrupted contract while other claims on the same contract are forfeited. The effects of a fraudulent act, therefore, have an impact on every aspect of contract performance and the entirety of the claim, making it impossible to distinguish between tainted and untainted claims, for which reason the contractor may not recover on any claims under the contract.

In *Little v. United States,* 138 Ct.Cl. 773, 778, 152 F.Supp. 84, 87–88 (1957), the court wrote:

It is true that the forfeiture statute was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V3020V–241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the government. *See also New York Mkt. Gardeners' Ass'n v. United States,* 43 Ct.Cl. 114, 136, 1907 WL 832 (1908). The court in *Kamen Soap Products Company v. United States,* 129 Ct.Cl. 619, 641, 124 F.Supp. 608, 620 (1954), also stated that "this statute goes further than merely banning fraudulent claims. It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim."

In *New York Market Gardeners' Association v. United States,* 43 Ct.Cl. 114, 136, 1907 WL 832 (1908), the Court of Claims also explained that all claims which are part of a contract during which a corrupt or fraudulent practice has occurred, even just on one aspect of the contract, should be forfeited. That court stated as follows:

The Revised Statutes provide that any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance of any part of any claim against the Government shall ipso facto forfeit the same. It would be the duty of the court to declare forfeited the entire contract if the proof certainly established the charge made. Harsh as the statutes are which impose such severe penalties for fraud in making up a claim, it is yet a necessary statute for the protection of the Government, and when such a charge is established this court will not only not hesitate to enforce such penalties but will go to whatever extreme under the law which can be justified by the facts proven.

*Id.; see also Ab–Tech Constr., Inc. v. United States,* 31 Fed.Cl. 429, 435–36 (1994), *aff'd,* 57 F.3d 1084, 1995 WL 358218 (Fed.Cir.1995); *Brown Constr. Trades, Inc. v. United States,* 23 Cl.Ct. 214, 216, 1991 WL 95813 (1991).

■ As noted above, the United States Court of Appeals for the Federal Circuit has articulated that, in order for the government to prevail under the Special Plea in Fraud statute, the government must prove by clear and convincing evidence "that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." *Young–Montenay, Inc. v. United States,* 15 F.3d at 1042 (citing *McCarthy v. United States,* 229 Ct.Cl. 361, 670 F.2d 996, 1004 (1982)); *see also Commercial Contractors, Inc. v. United States,* 154 F.3d at 1362. For a Special Plea in Fraud pursuant to 28 U.S.C. § 2514, the burden is on the government to establish by clear and convincing evidence that the claimant has committed the fraud alleged. *Young–Montenay, Inc. v. United States,* 15 F.3d at 1042; *McCarthy v. United States,* 670 at 1003; *O'Brien Gear & Mach. Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666, 672 (1979); *Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17, 22 (1977); *Kamen Soap Prods. Co. v. United States,* 124 F.Supp. at 620.

The government also has invoked the False Claims Act, 31 U.S.C. § 3729, to rebut the complaint filed in this court by the plaintiff Crane. The False Claims Act, 31 U.S.C. § 3729 provides the standards for liability:

(a) **Liability for certain acts.**—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ...

\* \* \*

(b) **Knowing and knowingly defined.**— For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

In addition, the False Claims Act contains a definition of "claim:"

(c) **Claim defined.**—For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729. The government must prove the elements of a cause of action under the False Claims Act by a preponderance of the evidence. *See* 31 U.S.C. § 3731(c).

■ The United States Court of Appeals for the Federal Circuit delineated the government's right to recovery under the Act:

In order to recover damages for violation of the False Claims Act, the government must establish that

(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment;

(2) the claim was false or fraudulent;

(3) the contractor knew the claim was false or fraudulent; and

(4) the United States suffered damages as a result of the false or fraudulent claim.

*Young–Montenay, Inc. v. United States,* 15 F.3d at 1043 (quoting *Miller v. United States,* 550 F.2d at 23).[26]

The United States Court of Appeals for the District of Columbia, in *United States v. Krizek,* 111 F.3d 934 (D.C.Cir.1997), carefully discussed and summarized the intent and knowledge required under the False Claims Act, as follows:

The question, therefore, is whether "reckless disregard" in this context is properly equated with willful misconduct or with aggravated gross negligence. In determining that gross negligence-plus was sufficient, the District Court cited legislative history equating reckless disregard with gross negligence.... [W]e agree with the thrust of this statement that the best reading of the Act defines reckless disregard as an extension of gross negligence. Section 3729(b)(2) of the Act provides liability for false statements made with deliberate ignorance. If the reckless disregard standard of section 3729(b)(3) served merely as a substitute for willful misconduct—to prevent the defendant from "deliberately blind[ing] himself to the consequences of his tortious action"—section (b)(3) would be redundant since section (b)(2) already covers such struthious conduct. *See Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988)

(citing the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"). Moreover, as the statute explicitly states that specific intent is not required, it is logical to conclude that reckless disregard in this context is not a "lesser form of intent," *see* [*SEC v.*] *Steadman,* 967 F.2d [636,] 641–42 [ (D.C.Cir.1992) ], but an extreme version of ordinary negligence.

*United States v. Krizek,* 111 F.3d at 941–42 (quotation omitted).

Congress specifically rejected requiring a specific intent to defraud under the False Claims Act. *See* 31 U.S.C. § 3729(b). Instead, it adopted a knowing standard, defined as "actual knowledge of the falsity," acting in "deliberate ignorance of the truth or falsity," or "acting in reckless disregard of the truth or falsity." *Id.* The standard was designed to address "the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know." *See* S.Rep. No. 99–345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. Thus, the statute covers not just those who set out to defraud the government, but also those who ignore obvious warning signs.

Therefore, a critical issue before the court is whether plaintiff had knowledge, as defined by the False Claims Act, that its claims to the contracting officer were false or fraudulent to include reckless disregard. To prove a violation of the False Claims Act, the government can, but need not prove that a

---

**26.** Under the False Claims Act, there is a statutory definition of the intent requirement necessary (*i.e.,* "the contractor knew the claim was false or fraudulent"); specifically, that a person acted " 'knowing' and 'knowingly' mean that a person, with respect to information—(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729. Many Circuit Courts of Appeal recognize that the plain language of the knowledge requirement does not require "specific intent" but instead incorporates the intent standards of "actual knowledge," "deliberate ignorance" and "reckless disregard." *See, e.g., Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776 (4th Cir.1999) (No. 98–1037);

*Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir.1998); *United States ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 303 (6th Cir.1998); *United States ex rel. Aakhus v. Dyncorp, Inc.,* 136 F.3d 676, 681–82 (10th Cir.1998); *United States v. Krizek,* 111 F.3d 934, 941–42 (D.C.Cir.1997); *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1478 (9th Cir.1996); *United States v. TDC Management Corp.,* 24 F.3d 292, 297–98 (D.C.Cir.1994); *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1420–21 (9th Cir. 1992). As noted above, under the False Claims Act, reckless disregard may be considered the equivalent of "aggravated form of gross negligence, or 'gross negligence-plus.' " *United States ex rel. Aakhus v. Dyncorp, Inc.,* 136 F.3d at 682 (citing *United States v. Krizek,* 111 F.3d at 941–42).

party intended to deceive the government. *United States v. TDC Management Corp.*, 24 F.3d 292, 298 (D.C.Cir.1994). The False Claims Act requires only that the government prove that a party knowingly, as defined under the Act, submitted a claim with reckless disregard to the falsity of the information. 31 U.S.C. § 3729(b); *United States v. TDC Management Corp.*, 24 F.3d at 298; *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1420 (9th Cir.1992). The case law stands for the proposition that a failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard, and a contractor that deliberately ignored false information submitted as part of a claim is liable under the False Claims Act. *United States v. TDC Management Corp.*, 24 F.3d at 298.

■ Contractors in a False Claims Act case frequently contend that their claims were not false because an interpretation of relevant regulations permits their claims. *See, e.g., Cahill v. Curtiss–Wright Corp.*, 57 F.Supp. 614, 616–17 (W.D.Ky.1944) ("A mistake in judgment, even though damaging, is not fraud.") (finding defendant free from False Claims Act liability because conditions complied with inspection requirements). A contractor, upon submission of a claim, who is aware of and takes advantage of a disputed legal issue does not knowingly commit fraud. *See Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478–79 (9th Cir.1996) (finding that the defendant made an imprecise cost allocation and that the government agency involved did not have settled view on proper interpretation of relevant statute for which reason holding that the evidence at most revealed a disputed legal issue).

However, it is a matter of law for the court to interpret a relevant statutory or regulatory requirement and if the language of the requirement is clear, even expert testimony is not persuasive. *See United States v. Race*, 632 F.2d 1114, 1120 (4th Cir.1980). As the United States Court of Appeals for the Fourth Circuit stated:

> We attach no weight to Commander Dolina's expert testimony on the interpretation of this clause. The clause includes no words of art, but only words of common

understanding and use, requiring no special expertise for their interpretation. Expert testimony on the meaning of such language is both superfluous and improper. *Marx & Co., Inc. v. Diners' Club, Inc.*, (2nd Cir.) 550 F.2d 505, 510, *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). The meaning of a clause, couched as this one was in language of common use and understanding, was purely a matter of law for the court, which should have granted the defendants' motion to dismiss any charge based on the defendants' billing for per diem under the contract.

*United States v. Race*, 632 F.2d at 1120; *see also United States v. Calhoon*, 97 F.3d 518, 523–24 (11th Cir.1996).

Moreover, an innocent mistake or mere negligence such as a math error or flawed reasoning may be excused. *Wang ex rel. United States v. FMC Corp.*, 975 F.2d at 1420–21. "The statutory phrase 'known to be false' does not mean 'scientifically untrue'; it means 'a lie.'" *Hagood v. Sonoma County Water Agency*, 81 F.3d at 1478–79 (citing *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815–16 (9th Cir.1995)); *see also United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.1999) (summarizing innocent mistake cases).

■ Thus, under the False Claims Act there must be a showing by the government of more than an innocent mistake or mere negligence. *Wang ex rel. United States v. FMC Corp.*, 975 F.2d at 1420. The government in the instant case is required to show the knowing presentation by the contractor of information known to be "false or fraudulent." *Id.; see also Young–Montenay, Inc. v. United States*, 15 F.3d at 1043. The government has "the burden to allege and prove that the statements were false under any reasonable interpretation." *United States v. Adler*, 623 F.2d 1287, 1289 (8th Cir.1980).

Although the statute defines "knowing and knowingly" and "claim," the courts have had to interpret the meaning of "false or fraudulent." *See* 31 U.S.C. § 3729(b)-(c). Unlike the question of intent, this element, specifically whether the claim was false or fraudu-

lent, involves a fact specific reasonableness determination because:

> There are thousands of different factual situations that citizens certify to various departments of the government every day. In some instances the false statement concerns something that in itself constitutes a crime. In many cases, however, as in the instant case, the criminal element is found exclusively in the misrepresentation or nondisclosure of a material fact.

*United States v. Seay,* 718 F.2d 1279, 1286 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984); *see also United States v. Race,* 632 F.2d at 1120; *United States v. Adler,* 623 F.2d at 1289; *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir.1978). However, the requisite intent to make false statements may be inferred, also on a fact specific basis, in appropriate circumstances. *See United States v. Adler,* 623 F.2d at 1289.

The government also raises the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604, to recover the false or unsupported portion of UMC's claim attributable to a misrepresentation of fact or fraud. The Contract Disputes Act provides that a contractor who is unable to support any part of a claim because of a misrepresentation of fact or fraud on the part of the contractor shall be liable to the government for the unsupported part of the claim, as well as for the government's costs expended in reviewing the claim. *See* 41 U.S.C. § 604. Specifically the statute states:

### § 604. Fraudulent claims

If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

The Contract Disputes Act defines the term "misrepresentation of fact" as

> a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper under-

standing of the matter in hand, made with intent to deceive or mislead.

41 U.S.C. § 601(7). To recover under the Contract Disputes Act, therefore, the government is required to demonstrate that the contractor made false or fraudulent statements in the claim that was submitted, with the requisite intent to deceive or mislead the government. *See id.* The United States Court of Appeals for the Federal Circuit delineated the standard of proof by which the government needs to establish a right to recovery under the Contract Disputes Act as follows:

> Although the statute does not prescribe a standard of proof, the "preponderance of the evidence" standard has been applied in the past, *see Al Munford, Inc. v. United States,* 34 Fed.Cl. 62, 67 (1995), *vacated on other grounds,* 86 F.3d 1178, 1996 WL 252834 (Fed.Cir.1996) (Table), and we agree that the traditional civil standard is appropriate here. *See Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389–90, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

*Commercial Contractors, Inc. v. United States,* 154 F.3d at 1362. Similarly, the United States Supreme Court appears to be edging toward a preponderance of the evidence standard in a widening variety of civil fraud cases. *See Grogan v. Garner,* 498 U.S. 279, 287–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (establishing the preponderance standard in bankruptcy fraud cases); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 387–89, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (establishing the preponderance standard in Securities & Exchange Commission fraud cases).

The fraud counterclaims raised by defendant, under the Special Plea in Fraud, the False Claims Act, and the Contract Disputes Act, all involve two common elements: (1) some form of misrepresentation of fact or false claim, and (2) some degree of knowledge of a falsity. Therefore, the court will frame its analysis of defendant's fraud claims in two parts. The court will first examine the question of whether Crane's aircraft is what Crane purports it to be, namely, a Bell 204B with the serial number 2030. If the

court is satisfied that plaintiff, in fact, does possess a commercial Bell 204B, then no fraudulent misrepresentations have occurred. Second, the court will examine whether Crane was aware, or should have been aware, that its helicopter was not what Crane represented the helicopter to be to the Forest Service. If the answer to this latter question is "no," then no fraudulent misrepresentation can be established in this case.[27]

## I. The identity of Crane's helicopter

■ The defendant in this case argues that Crane fraudulently obtained its contracts with the government because Crane falsely represented that it was furnishing the services of a Bell 204B aircraft. The government contends that Crane's aircraft, which currently bears a data plate stating that it is "Serial Number 2030," is actually not an "authentic" Bell Model 204B commercial helicopter. According to defendant's expert witness in aviation-related matters, Mr. Frederic L. Wilken, Crane's aircraft is comprised of both military and commercial components, and the aircraft's main fuselage[28] structure does not conform to a commercial Bell Model 204B series helicopter.

Defendant first alleges that Crane's helicopter cannot be the "authentic" S/N 2030 because an aircraft with that serial number was destroyed, according to FAA and NTSB records, in a crash in Stockton, Alabama on January 28, 1988.[29] The government states that "Federal Aviation Administration records contain a form 8050-17-1 indicating that serial number 2030 was totally destroyed in the January 28, 1988 accident. The National Transportation Safety Board report of the

27. Prior to beginning these analyses, the court notes that the plaintiff has questioned the court's ability to exercise jurisdiction over the fraud counterclaims. Plaintiff argues that the FAA has "exclusive authority over the promulgation and enforcement of regulations relating to civilian aviation," and cites the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. §§ 40101–49101 (West 1994 & Supp.1999). Crane states that S/N 2030 has an FAA-issued airworthiness certificate, and plaintiff asserts that "[a] finding by this Court that plaintiff's aircraft is somehow not a Bell 204B as *certified* by the FAA would effectively invalidate the Airworthiness Certificate by rendering it meaningless." (Emphasis in original.)

Plaintiff correctly points out that the various United States Courts of Appeals have exclusive jurisdiction to review FAA Orders. Section 46110(a) of the Federal Aviation Administration Authorization Act of 1994 states:

Filing and venue.—... a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Federal Aviation Administration with respect to aviation safety duties and powers designated to be carried out by the Administrator) under this part may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

49 U.S.C. § 46110(a) (1994). However, FAA Orders are not the focus of review in the instant case. At issue are the representations made to the Forest Service during contract formation and management. Moreover, a finding by this court that Crane's helicopter is not the same model as that stated on its airworthiness certificate does not automatically invalidate the certificate as plaintiff implies. The court does not assert jurisdiction to overturn FAA decisions and directives. Any action on the FAA certificates or directives remains to be reviewed, if appropriate, at the FAA. This court clearly has jurisdiction to decide disputes concerning government contracts such as the claim filed by the plaintiff in this court, which also resulted in the government's fraud counterclaims. *See* 28 U.S.C. § 1491 (1994). Under the applicable statutes, the fraud counterclaims could bar plaintiff's original complaint filed in this court, and the court may properly entertain those counterclaims. *See* 28 U.S.C. § 2508 (1994); *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 542 (Fed.Cir.1988).

28. The fuselage is "the central structure of an airplane, containing passenger and cargo comparments,[sic] and to which are attached the tail assembly and wings." *Random House Webster's College Dictionary* 531 (1999).

29. On July 22, 1994, James Burt III of Bell Helicopters sent a facsimile message to Paul Markowitz of the Forest Service concerning S/N 2030. It stated, in part: "The original Bell aircraft of that serial number was reported lost in Laos in 1967 while flying for Air America. Be advised that said aircraft was destroyed (again) 1/28/88 5 miles west of Stockton, Alabama." While this implies that S/N 2030 may have been destroyed in 1967, there is no persuasive evidence in the record to that effect, and defendant has not raised that contention in its post-trial briefings.

January 28, 1988 accident also indicates that the aircraft was destroyed."

The parties do not dispute that S/N 2030 ran out of fuel and crashed on January 28, 1988 while being leased by Tensaw Helicopters of Mobile, Alabama. Crane, however, does disagree with the significance the government places on portions of the FAA and NTSB records relating to the crash. It is true that, in the NTSB report, the crash investigator chose "Destroyed" from the possibilities listed under "Aircraft Damage." However, there is a supplement to the NTSB crash report which allowed the investigator to provide a more specific analysis of the aircraft damage. In this "Crash Kinematics" section of the report, the investigator indicated that the fuselage was neither totally destroyed nor split. "Fuselage collapse" and "Fuselage crush" were not noted as being pertinent. Furthermore, for "Cockpit Damage," the investigator checked "Part collapsed," and for "Forward Cabin Damage," the investigator checked "Intact." In both of these latter two damage analyses, the investigator had the option of indicating "Destroyed," but chose not to do so.

There is no persuasive evidence in the record that, after the report was filled out, the aircraft was destroyed or not repaired. In the face of the non-conclusive evidence noted above, the court is hesitant to assign finality to the investigator's earlier choice of the word "Destroyed" in the space on his report marked "Aircraft Damage." Similarly, the defendant has not convinced the court that the form 8050–17–1 in the FAA records can be taken as final evidence of S/N 2030's destruction. This form states that S/N 2030 "has been reported totally destroyed," and it is titled "DEREGISTRATION OF UNITED STATES CIVIL AIRCRAFT" and "AIRCRAFT ACCIDENT NOTICE." However, the form was never signed, initialed or dated. Boxes which state "Official approving cancellation," and "The above registration has been canceled and records adjusted accordingly," are both left blank. Furthermore, S/N 2030 has been registered continuously with the FAA under the numbers N8514F or N109CH since its manufacture. Thus, the court agrees with plaintiff that the FAA has never

considered this Form 8050–17–1 to be a valid deregistration notice. The defendant has failed to carry its burden of proof on this issue.

Next, the government asserts that "[t]he complete lack of repair signature consistent with the 1988 accident, as depicted in the photographs accompanying the NTSB report[,] indicates that Crane's aircraft is not [S/N 2030]." The government's expert in aviation-related matters stated at trial:

I found that the aircraft log books indicated a very extensive repair. I mean, we've got six or seven pages of typed entries in the aircraft log book for 2030, listing part upon part upon part. It would appear that a very extensive repair took place. But, the inspection of the aircraft that I conducted didn't indicate that there was a repair made. I didn't see any evidence of repair.

So, to resolve that conflict, I attempted to find out whether Southern Aero had approved data that allowed them by FAA standards to repair the aircraft. I couldn't find any approved data. I found the opposite. I found no forms filed with the FAA. Bell Helicopter didn't provide data. And, if there was approved data and they did the repair, I didn't see any evidence of it.

So, it leads me to the conclusion that the aircraft fuselage was not repaired, it was replaced.

Tony Stier, a product support engineer from Bell Helicopter, also noted a lack of evidence of damage repair entries in Crane's logbooks consistent with S/N 2030's 1988 crash. Stier stated that he did not believe that it would have been economically feasible to repair the helicopter from the condition which was depicted in the NTSB photos of the crash.

The testimony elicited at trial from several witnesses, however, failed to adequately support the government's contentions that S/N 2030 was not repaired, and, on the contrary, indicated that refurbishment was accomplished. After the 1988 accident, S/N 2030 was brought to the facilities of Southern Aero Corp. to undergo repair. Southern Aero was operating as an FAA-approved repair station, and the FAA inspected Southern Aero's operation every year to ensure com-

pliance with the requirements for functioning as a Part 145 repair station.[30] At the time of the repair, Southern Aero had between twelve and twenty-five licensed mechanics on staff who were FAA-authorized, one or two full-time specialists in the skin repair of helicopters, and highly qualified sheetmetal technicians who were concurrently employed at the nearby Fort Rucker Army installation. There apparently were few if any restrictions on the level of repair which Southern Aero could accomplish on a Bell 204B helicopter airframe, and the repair station possessed a "jig" fixture that had been designed by Bell Helicopter specifically for 204B airframe repair.

Plaintiff's expert in helicopter-related matters, George Powell, was questioned at trial about whether Southern Aero would have had the necessary data and equipment to repair S/N 2030:

> Q. Mr. Powell, my question to you is after having performed the investigation and inquiry that you have done in this case, is there any question in your mind that Southern Aero Corporation had the approved data sufficient to accomplish the repair of the helicopter as indicated would be necessary from [the NTSB accident photos] to repair that helicopter to the configuration and condition that you observed when you inspected Crane's helicopter?
>
> A. I have no question. They had the certificate. They had a repair station manual. They had a broad scope authorized with fixtures. With their experience, they would be one of the most advanced repair stations with these capabilities.
>
> Given other documents and guides, it would not be difficult to properly repair an aircraft such as this with proper alignment in the fixtures and replacing individual parts or assemblies or repairing them

without the patches that are often assumed in repairs.

Thomas Miller, an FAA aviation safety inspector specializing in airworthiness, testified similarly. He stated that he knows of no part of a Bell 204B which cannot be repaired. In fact, Tony Stier admitted on cross-examination that, even if an aircraft is damaged to the extent depicted in the NTSB photos of S/N 2030's Alabama crash, repair is possible. Those very same photos were the basis for Stier's contention that repair of S/N 2030 would not have been economically feasible.[31]

As far as the lack of repair evidence, William Kemper, an aircraft mechanic who has been employed for sixteen years by Big Valley Aviation, Crane's maintenance center, said that repairs are conducted with a goal of external invisibility because repair technicians take "pride in workmanship." He also stated that "you try to make the repair cosmetically presentable as possible...." Furthermore, George Powell noted that:

> On the site visit we had been asked several times about where is the repair signature. Those who are, and I include myself, professionals in repair, and any repair station would tell you when we heard that [question], that it is not possible long after the fact to say this is exactly where something was assembled to another part or this is where it was repaired on a helicopter.

Mr. Powell concluded:

> The repair was of 2030 I said following the accident. Components of that aircraft were repaired. Parts and assemblies were obtained to integrate with them. This would be our very probable scenario of the repair. It was 2030 repaired with some of the same parts, some new parts that were FAA approved, some used parts that were

---

**30.** To be an FAA-certified aircraft repair station, a facility must comply with the guidelines laid out in 14 C.F.R. § 145. *See* 14 C.F.R. § 145.1(a) (1992) ("This part prescribes the requirements for issuing repair station certificates and associated ratings to facilities for the maintenance and alteration of airframes, power plants, propellers, or appliances, and prescribes the general operating rules for the holders of those certificates and ratings.").

**31.** Although Mr. Stier offered his opinion that repair of the aircraft was economically impractical, he never visited Southern Aero during its period of operation. Thus, he does not have first-hand knowledge of the repair station's capabilities.

FAA approved, all contributing to a final conforming aircraft.

The defendant has failed to persuade the court that Crane's helicopter is not S/N 2030 under the theory that S/N 2030 was previously destroyed, or under the theory that S/N 2030 could not have been or was not repaired after its 1988 crash in Alabama.

The court, therefore, now turns to defendant's narrower allegations that specific parts of S/N 2030 do not conform to the Bell 204B type certificate. The court notes at the outset of this "non-conformity" discussion that the government has failed to produce original design drawings which would clearly establish a certified type design for the Bell 204B model helicopter.[32] As a result, plaintiff raises the argument that "[w]ithout an established 'baseline' of the required configuration for the helicopter, such that a condition *observed* on the helicopter could be compared to a condition *required*, any discussion of alleged physical non-conformities necessarily degenerates into an exercise in pure speculation." (Emphasis in original.) The court, however, disagrees with plaintiff's assertion. Even without a type design definitively established by original diagrams and schematics, there is ample evidence in the record from which conclusions can be drawn as to what configuration S/N 2030 should possess. This evidence includes the Bell 204B type certificate data sheet, the Bell 204B Illustrated Parts Breakdown, the Bell 204B Maintenance and Overhaul Manual, the Bell 204B Flight Manual, FAA Form 337s for approved type design changes, and the testimony of factual witnesses and qualified experts who have many years of experience operating and maintaining Bell 204Bs and similar military model helicopters.

The government contends, and offered evidence at trial, that Crane's helicopter is not the "authentic" S/N 2030 because there are non-conformities with respect to (1) numerous unauthorized military parts, (2) missing passenger steps and passenger step support structures, (3) the cabin door posts, and (4) the main beams.[33]

*Military parts*

Mr. Wilken's "Report of Findings" came to the conclusion that Crane's helicopter was not a commercial Bell 204B Series Helicopter as defined by Bell Helicopter's engineering drawings.[34] His Report stated that "[t]he helicopter is comprised of a combination of military and commercial parts and compo-

---

**32.** The difficult task which the government would have faced had it attempted to establish the exact configuration of S/N 2030 through the use of design drawings was aptly described by plaintiff:

In order to demonstrate even a *prima facie* case for nonconformities to the design drawings, the Government would have to produce, at minimum, a set of design drawings which is specific to the Bell 204B, and in fact, specific either to this serial number or to the range of serial numbers of which S/N 2030 is a member. The Government would also have to establish that such drawings were indeed part of the "type design" for the Bell 204B, ...

The Government would also have to demonstrate that the particular drawings in evidence had FAA approval under 14 C.F.R. § 21.21 ("Issue of Type Certificates"). Additionally, the Government would have to demonstrate that such drawings included *all* approved modifications to the type design peculiar to S/N 2030, both before and after manufacture. Otherwise, the drawings would have no relevance as to the conformity of the Crane helicopter specifically, since there are any number of variables which could account for changes in the helicopter's configuration, including 25 years of Airworthiness Directives (which re-

quire changes), major alterations approved by FAA Form 337's, changes made at the factory to accommodate the special requests of Bell's customer (i.e., Air America), etc.

(Footnotes omitted; emphasis in original.)

**33.** Defendant also alleges nonconformities due to the absence from Crane's helicopter of (1) certain vapor and fire protections, (2) a plastic window on the left hand door post which facilitates observation of the door latch, and (3) a "scupper" to divert accidentally spilled fuel. The government, however, has not proven that the FAA requires these items. Defendant relies on their mention in FAA documents, but those documents are merely minutes of meetings which were held during the type certification process. Even if these items were discussed during those meetings, there is nothing in the record to indicate that they eventually became requirements. Moreover, the features do not appear in the Bell 204B type certificate data sheet, the Bell 204B Maintenance and Overhaul Manual, the Bell 204B Flight Manual or the Bell 204B Illustrated Parts Breakdown.

**34.** These drawings were never introduced as evidence at trial.

nents. Accordingly, the aircraft cannot be classified as a military UH–1 Series Helicopter or a commercial Bell 204–B Series Helicopter." At trial, William Reichardt, an FAA aviation safety inspector with oversight responsibility for numerous repair stations, defined "military parts" as "components or parts that had been used by the military or . . . serviced by the military, or delivered to the military by the manufacturer." Military parts are treated differently than civilian parts because higher stresses are placed on aircraft and components in military operation.

The FAA, however, does allow the use of military parts on civilian aircraft as long as certain requirements are met. On August 26, 1976, the FAA issued an Advisory Circular, numbered 20–62D, the purpose of which was to provide "information and guidance for use in determining the quality, eligibility and traceability of aeronautical parts and materials intended for installation on U.S. typecertificated products and to enable compliance with the applicable regulations." The Advisory Circular outlines the conditions for use of surplus military parts:

> 9. SURPLUS. Many materials, parts, appliances, and components that have been released as surplus by the military service or by manufacturers may originate from obsolete or overstocked items. Parts obtained from surplus sources may be used, provided it is established that they meet the standards to which they were manufactured, interchangeability with the original part can be established, and they are in compliance with all applicable [Airworthiness Directives].

The interchangeability of identical military and civilian parts was confirmed by Thomas Miller, the FAA aviation safety inspector specializing in airworthiness. He was asked:

> Q. As you understand it, do the Federal Aviation Regulations forbid the use of genuine Bell parts which have once been in use on a military aircraft from being used on a commercial aircraft if that commercial aircraft accepts parts of identical part numbers and specifications?

> A. There is no rule that says you can't use it. On some particular aircraft, they are used all the time.

Consistent with this notion, the government's expert, Mr. Wilken, admitted during his testimony that major portions of the cockpit, airframe and fuselage can be replaced with conforming parts without destroying the authenticity or identity of an aircraft, and Paul McKenzie, the Director of Maintenance at plaintiff's FAA-approved Bell service center—Big Valley Aviation—testified that not only is the Crane helicopter a Bell 204B, but also that there are no counterfeit, "bogus" or unapproved parts on Crane's helicopter. Accordingly, the defendant has failed to demonstrate to the court that the presence of any "military" parts on Crane's helicopter is improper, nor does the use of military parts transform a 204B into a military aircraft.

*Passengers steps and passenger step support structures*

At trial, in testimony and in documents introduced into evidence, both Tony Stier and Fred Wilken, defendant's expert witness, raised concerns about the lack of passenger steps and associated support structures for Crane's helicopter. Defendant states:

> Cabin step support structures are a feature that are unique to the Bell Model 204B airframe. Mr. Wilken's research established that the real Bell 204B, serial number 2030 did have cabin steps. The Crane aircraft does not have any evidence or indication that cabin steps, or the support structure, were ever part of the airframe of the Crane aircraft. Nor is there any indication of repair or replacement of the bulkheads, where the step support structure is required, to support an allegation that the structures have been "repaired out" of aircraft number 2030.

As many commercial 204B operators choose to remove the steps, Wilken was not concerned about their absence. Rather, he found the absence of the internal support structures for the steps to be troubling, because commercial 204B models generally possess the step support structures, while the similar military UH–1 models do not.

The court, however, finds that the absence of the steps and step support structures is not significant. Tony Stier, in his deposition for this case, admitted that, in most cases, "authentic" 204Bs no longer have their original step assemblies installed. He further acknowledged that the only function of the step support structure is to support passenger steps, and that the support structure is not needed without the steps. Moreover, when the Forest Service's Paul Markowitz raised the issue of the missing support structures with the FAA, Tom Tesseny, an aviation safety inspector for the FAA at the Oakland FSDO, inspected Crane's helicopter on two separate occasions. On January 26, 1996, Tesseny wrote to Markowitz and stated, regarding the step support structures, that:

> The helicopter was extensively repaired after the crash of 1988 by an FAR, Part 145 Repair Station with the appropriate ratings. During that repair and well before the purchase of N109CH by Crane Helicopters Services, apparently the structural members for the outside steps were not installed under the floor along with the obvious steps themselves. Since the purchase of N109CH, Crane Helicopters Services and their repair facility, Big Valley Aviation, Inc. have tried to order the appropriate step assemblies to install on the helicopter but have not been successful in obtaining those assemblies due to the rarity and unavailability of the assemblies themselves and all attaching parts. This office will work with Crane Helicopters Services and Big Valley Aviation, Inc. in the approval of either the installation or removal of the step assemblies. It appears that the [absence] of the structure for the steps that [is] normally installed under the main cabin floor [does] not [affect] the structural integrity of the helicopter cabin section.
>
> Since the purchase of N109CH and the certification of Crane Helicopter Services in 1990 this helicopter has been operated and maintained in accordance with all appropriate manufacturer maintenance requirements and all appropriate Part 135 Federal Aviation Regulations. The historical maintenance records appear to be in order. All entries indicate inspections and maintenance performed, repairs or alterations accomplished, Airworthiness Directives complied with and life limited component cards for all appropriate parts installed on the helicopter.

On February 20, 1996, subsequent to the writing of this letter, Tesseny executed an FAA Form 337 which gave FAA approval for the operation of S/N 2030 without the steps and step support structures. Conversations between Tesseny, Paul McKenzie of Big Valley Aviation, and Bell Helicopter had led all concerned to the conclusion that the steps, and, thus, the step support brackets, were non-essential to the aircraft since there was no mention of them in the type certificate data sheet. While the Form 337 was executed after the contracts at issue in this case, there is nothing in the record indicating that the absence of the steps and associated support structures would have been a non-conformity at any time while Crane has possessed its helicopter.

*Cabin door posts*

The first Bell 204Bs which were produced, Serial Numbers 2001–2025, had a different door closure than that found on Serial Number 2026 and later-built helicopters. Sam Brindley, who was a project engineer for the 204–B program, explained the reason for the change:

> Ship serial number 1 or 2001 through 2025 had a sliding door with a single latch located more or less in the center—in the forward edge of the door halfway between the top and the bottom. And it engaged a striker in the door post when it was closed. We had some service complaints about the fact that the doors didn't stay tightly sealed to the door post. As the aircraft would fly, the fuselage would deflect a little bit due to air loads and maneuver loads and sometimes the doors would gap a little bit in flight and make air noise and let rain leak in and whatever other problems. So we decided maybe [we] could fix that by having two latches. Again, on the forward edge of the door, one about eight or ten inches from the top of the door and one about eight or ten inches from the

bottom of the door so when you engaged the airframe structure, these two latches [cinch it] tighter and more reliably to the structure and it minimizes any sort of gaping due to flight loads.

At trial, the government's expert witness, Mr. Wilken, noted that UH–1 series military aircraft utilize a single point latch assembly at the center of the door, similar to the earlier-produced commercial 204Bs. Defendant contends that:

> Mr. Wilken's examination revealed that, while Crane's aircraft possesses a dual point door latch system consistent with a commercial Bell Model 204B, the Crane's [sic] aircraft was modified to accommodate a dual point door system. The opening for the single point latch system that is a characteristic of military aircraft has been concealed upon the Crane aircraft.

Mr. Wilken's Report of Findings added further detail:

> The left door post had been modified to cover the center latch hold with sheet metal. The right side cabin door post had been modified to cover the center latch hold with the use of rubber trim and masking tape. This modification and the attempt to hide the center hole clearly proves that there was an attempt to conceal the fact that this helicopter was changed to appear to be a commercial Bell 204–B Series Helicopter. . . .

Crane does not dispute that the door posts on its helicopter have center holes in addition to those for the current dual point door-latching system. Rather, plaintiff's expert in helicopter-related matters, George Powell, explained at trial that inspection records for S/N 2030 indicate that the door frames were modified from a single latch to a dual latch configuration during the manufacturing of the helicopter. He testified:

> What happened to this aircraft in the factory? The conformity issues always must relate to a particular serial number aircraft. The 204–Bs, totaling 70, were made in ten production lot releases. Serial No.2030 was in the release of ten aircraft that started at 2026 through 2035.

At that, as we would refer in the factory, ship break for that group, which included 2030, there was a change from the configuration of the first 25 aircraft. They had a single latch. An engineering change was issued to go to the second [group].

As sometimes happens when you're making so many aircraft—I said production rates got up as high as, not strictly on this model, but all models in the factory got up to as many as ten or 11 a day. . . . With all this activity and with engineering wishing to change, you sometimes miss on the assembly line or miss on the detail part manufacture.

We have records for Serial No. 2030 that indicate in the factory that 2030 had a single latch because the change was missed, and the aircraft had gone by the normal point of latch installation. The aircraft had to be reworked to put the two latches in. In the process of working the two latches, naturally there's a hole left where the previous was.

The records of which Mr. Powell spoke are the Aircraft Assembly and Inspection Logs (AILs) for the manufacturing process of the helicopter. In particular, the AIL for the "Cabin Primary" portion of the fuselage indicates that particular hardware was removed and other hardware was then added. Mr. Powell understood this notation in the record to signify that, as the helicopter had gone past the point of having the single-latch assembly doorposts installed, a correction had to be made to the posts so they would conform to the engineering drawings for Serial Numbers 2026–2035.[35]

Sam Brindley, who was a project engineer on the Bell 204B program, disagreed. He stated that the AIL in question did not rework any parts on the assembly line. Rather, he characterized it as a "planning" document that brought the engineering change to the attention of those in charge of assembly line preparation. He said it was a signal to certain persons to "take those old parts off your planning sheet and put these new parts on your planning sheet so that when Ship

---

**35.** Mr. Powell did offer the caveat that there is no way to be sure that the current door frames on Crane's helicopter are the same ones which were originally installed.

2030 is ready for assembly you'll have the right parts available...."

The court finds more plausible the validity of Mr. Powell's theory on the AIL's purpose. It is counter-intuitive that a "planning" document would be titled "INSPECTION REC-ORD." The definition of inspection, a "formal or official viewing or examination," [36] necessarily presupposes that an object being inspected already exists. Furthermore, on the first page of the AIL, boxes have been checked for "ASSEMBLY" and "FINAL AS-SEMBLY." This apparently signifies that all assembly operations were already complete for the component grouping called the "CABIN PRIMARY," which includes the door posts.

Moreover, the government's own expert witness, Mr. Wilken, admitted at trial that the doorposts currently installed on Crane's helicopter conform to the type certificate for a commercial Bell 204B. Therefore, even though defendant may believe the doorposts to be circumstantial evidence that Crane's Helicopter is military in origin, they cannot be considered nonconformities in their current state.

*Main beams*

After Tony Stier conducted his inspection of Crane's helicopter on February 19, 1994, he mentioned to the Lotspeiches that the main beams of the aircraft did not look typical of a 204B.[37] Later, at trial, defendant's expert witness, Fred Wilken, testified that the right hand main beam on Crane's helicopter was different from that of Bell Model 204B Serial Number 2017, which defendant held out to be a commercial Bell 204B for the purposes of comparison.

The court, however, like the plaintiff, is reluctant to consider Serial Number 2017 a standard against which to find nonconformities. S/N 2017 has no certificate of airworthiness and it was deregistered with the FAA on November 17, 1994. Mr. Wilken was unaware of these facts and others which cast

doubt on the usefulness of S/N 2017 as a baseline configuration. The following colloquy occurred at trial:

Q. Were you aware, Mr. Wilken, that [S/N 2017] was deregistered in the United States?

A. No, I was not aware of that.

Q. Were you aware that helicopter serial number 2017 had parts removed to support a UH–1H helicopter?

A. No, I was not aware of that.

Q. Were you aware that the airframe on serial number 2017 was cracked ...?

A. No, I was not.

Q. Were you aware that the hubs and blades had been removed and the transmission would require re-work to return to service and that the chief of maintenance at [the National Aeronautics and Space Administration, the former user of S/N 2017] considers that the helicopter "is no longer flyable or repairable by this center," as stated in 1995?

A. No, I was not aware of that....

In addition, the parties do not agree on whether S/N 2017 has an unapproved military engine and a military tailboom.

It is the court's opinion that Mr. Stier's original statement about the main beams, while less than unequivocal at the time of his inspection, became even less persuasive in light of his trial testimony that he did not perform a full examination. Stier stated at trial that when he inspected Crane's helicopter, the transmission was obstructing his view and he did not feel it would have been appropriate to have plaintiff remove the transmission at that time. Meanwhile, Mr. Wilken's critique of the main beams suffers from the lack of a standard against which to judge the beams. The court has already noted the deficiencies of S/N 2017 in that regard, and, furthermore, Mr. Wilken admitted at trial that he has not seen any design

---

**36.** *Random House Webster's College Dictionary* 682 (1999).

**37.** Stier defined the main beams as:

[T]wo main beams that run the full length of the fuselage. In laymen's terms, you can char-

acterize this as the spine. In this particular case, there are two spines and then there are bulkheads, or—or ribs that are attached to these two spines. These provide the—the backbone of the aircraft to which everything else is attached.

drawings for the main beams for either a commercial 204B model or a military UH–1 model helicopter. Here, again, the defendant has failed to convince the court that there is a nonconformity.

The court has not been persuaded that there are nonconformities on Crane's Helicopter which make it something other than a commercial Bell Model 204B helicopter. The physical and testimonial evidence noted above can only support the conclusion that Crane's helicopter is a civilian Bell Model 204B with the serial number 2030, as plaintiff purports it to be. Numerous witnesses expressed opinions consistent with this finding. Thomas Tesseny, an aviation safety inspector for the Oakland FSDO of the FAA, said that he has not been presented with any information subsequent to his prior examination of S/N 2030 that indicates the aircraft is anything but Bell Model 204B Serial Number 2030. Ray Murphy, a principal operations inspector with the Oakland FSDO, similarly has not changed his 1990 conclusion that Crane's helicopter is S/N 2030. Ray Etcheverry, the overseer of the inspection department at Big Valley Aviation, concluded that Crane's helicopter is a Bell 204B. Paul McKenzie, the director of maintenance at Big Valley Aviation, stated that the information in the Bell 204B Maintenance and Overhaul Manual, the Bell 204B Illustrated Parts Breakdown and the Bell 204B structural repair manual always conformed to what he saw on plaintiff's helicopter. McKenzie knew of no counterfeit, "bogus" or unapproved parts on S/N 2030. William Kemper, an aircraft mechanic employed by Big Valley Aviation for sixteen years, stated that Crane possesses a Bell 204B and he has no reason to doubt that.

The government, as the counter-plaintiff, bears the burden of proof with respect to the fraud claims in this case. At a minimum, the government must convince the court that it has met the requirements of the False Claims Act and/or § 604 of the Contract Disputes Act by a preponderance of the evidence. *See* 31 U.S.C. § 3731(c); *Commercial Contractors, Inc. v. United States*, 154 F.3d at 1362. To prevail on its fraud claims under the Special Plea in Fraud, 28 U.S.C.

§ 2514, the requirements must be proven by clear and convincing evidence. *See Young–Montenay, Inc. v. United States*, 15 F.3d at 1042. A common requirement under all of these statutes is that there be a false or fraudulent statement. *See Young–Montenay, Inc. v. United States*, 15 F.3d at 1043; 41 U.S.C. §§ 601(7), 604; 28 U.S.C. § 2514; *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d at 1559. In the instant case, the government has attempted to prove that Crane Helicopter Services made a false statement to the government when plaintiff indicated, on fire suppression contracts with the Forest Service, that plaintiff was furnishing the services of a commercial Bell 204B helicopter. As defendant has failed to persuade the court by a preponderance of the evidence that Crane's helicopter is not a commercial Bell Model 204B, S/N 2030, the court holds that the government has failed to prove that plaintiff made false or fraudulent statements when plaintiff offered to provide the services of that particular type of helicopter. Thus, because no fraud has been proven, each of defendant's counterclaims fails.

II. Crane's knowledge of its helicopter's identity

As discussed above, defendant has not proven that any fraudulent or false statement was made by the plaintiff. Because the making of a false or fraudulent statement is a requirement for recovering under each of the different fraud claims brought by the government, the claims cannot succeed. In addition, each of the fraud claims also requires an element of knowledge on the part of the party accused of fraud. The claim under the fraud provision of the Contract Disputes Act calls for an intent to deceive. *See J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d at 1559; 41 U.S.C. § 601(7). The Special Plea in Fraud claim requires "that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." *Young–Montenay, Inc. v. United States*, 15 F.3d at 1042 (citing *McCarthy v. United States*, 670 F.2d at 1004). Under the False Claims Act, however, no specific intent to defraud is required. *See* 31 U.S.C. § 3729(b). Rather, there must be "actual knowledge of the falsity," action in "deliber-

ate ignorance of the truth or falsity," or action in "reckless disregard of the truth or falsity." *Id.*

Thus, at a minimum, to meet the least stringent "knowledge" standard of the four fraud claims, the government must show that plaintiff knowingly submitted a claim with reckless disregard to the falsity of the information. *See id.; United States v. TDC Management Corp.,* 24 F.3d at 298; *Chen–Cheng Wang ex rel. United States v. FMC Corp.,* 975 F.2d at 1420. As detailed below, even if the government had proven that Crane's helicopter is not S/N 2030, the government's fraud claims would still fail. The defendant has not persuaded the court that Crane acted with reckless disregard of the truth, let alone the more stringent standards of acting with deliberate ignorance, acting with actual knowledge or acting with specific intent to deceive.

According to the defendant:

A review of the transcript in this case shows a pattern of events indicating that Crane was provided repeated notice that its aircraft was not an authentic Bell Model 204B. Aside from the constant notice, however, circumstantial evidence supports a finding that Crane may have known all along about the questionable origins of its aircraft. The consistent thread that can be traced through the entire case is Crane's attempt to maintain some sort of plausible denial regarding knowledge of the questionable origins of its aircraft.

The government contends that the Lotspeiches should have had doubts about the origins of their helicopter even at the time of purchase in early 1990. According to defendant, "[t]he circumstances surrounding the purchase of the aircraft contrast with all indications of industry standards regarding aircraft history, maintenance records, and prepurchase conduct." Defendant argued at trial that Crane was presented with insufficient records for the helicopter and its components, and the Lotspeiches should have been more diligent in conducting a thorough pre-buy inspection of the aircraft and its records.

With regard to the procedures which Crane undertook in contemplation of the heli-copter's purchase, the court, as discussed below, is not convinced that Steve Lotspeich's actions were insufficient or inappropriate, nor were they in reckless disregard of the truth. The Lotspeiches undertook a prudent and thorough inspection of the helicopter. They had purchased used helicopters in the past, and there was nothing unusual documented in this record in their encounters with Southern Aero which should have caused them to doubt the authenticity of the aircraft which they were purchasing.

The government has suggested that:

In the context of a prebuy or valuation inspection, one reviews all of the records concerning that aircraft as well as the credibility of the facility that was performing the maintenance on that aircraft. A physical inspection of the aircraft is performed and one makes sure the paperwork matches the aircraft.

Similarly, Ray Etcheverry, overseer of the inspection department at Big Valley Aviation, described the steps which Big Valley's employees take when conducting pre-buy inspections:

They look at the records. They make sure that there are records for the aircraft. They look at the aircraft to see if it's what [the seller says] it is, what the model is. They confirm [registration] numbers, serial numbers, model numbers. They look at the general appearance. They do not open [the helicopters] up and do a lot of inspecting unless it's requested by a buyer, which takes a lot of tools and a lot of time.

They do look, basically, for corrosion. They do look at the overall condition of interior, the glass, the exterior and they look at the component times, because that's quite important as far as how near overhaul [the parts] are and so on.

The record demonstrates that Steve and Linda Lotspeich took these steps. On their first visit to Southern Aero in January of 1990, they looked at maintenance and component records, examined the component overhaul and engine shops, talked to the owners of Southern Aero, and talked to the maintenance people who were working on the aircraft during refurbishment. On a second

visit to Southern Aero in February of 1990, the Lotspeiches inspected the helicopter and its logbook, and checked to make sure that the card records of the components matched the components themselves. Steve Lotspeich then performed test flights in the helicopter.

The Lotspeiches had previously decided that the Bell 204B "Super" helicopter would best suit their needs, and only Southern Aero had FAA approval to create "Super" Bell 204Bs by installing the more powerful Lycoming T53–13B engine. While the Lotspeiches were unable to "shop around," any concerns which they had about Southern Aero's competency to refurbish and maintain helicopters would have been assuaged by the facility's rating as an FAA-approved Part 145 repair station. As plaintiff's expert, George Powell, noted at trial:

> I think you will generally receive a greater assurance by buying an aircraft from a repair station, particularly if it's following a repair, [than] you will from an individual owner.... As a representative of the FAA, I think that they have added responsibility to insure that the aircraft is in an airworthy condition. I'm not suggesting

that individuals don't, but I think on net, it gives a higher probability.

The government contends that Steve Lotspeich should have been suspicious when he was only given the most-recent logbook, and when that logbook did not explicitly detail the extensive steps which were taken to refurbish the helicopter.[38] The logbooks, however, contained the required, albeit terse, information as necessitated by 14 C.F.R. § 43 Appendix B (1990).[39] While the component record cards did not explain the life history of each component, there has been no accusation that they failed to provide the information which is actually required by the FAA under 14 C.F.R. §§ 43, 91 and 135.

Steve Lotspeich testified that old log books were not important to him because they detailed someone else's history with an aircraft, and they simply were not required information. Once Southern Aero overhauled and repaired the helicopter, then everything that happened previously was no longer "useful information," and the old log books were not required information according to Lotspeich. As far as the component records, Lotspeich was satisfied with the records which Southern Aero provided:

> (1) Use the customer's work order upon which the repair is recorded;
> (2) Give the aircraft owner a signed copy of the work order and retain a duplicate copy for at least two years from the date of approval for return to service of the aircraft, airframe, aircraft engine, propeller, or appliance;
> (3) Give the aircraft owner a maintenance release signed by an authorized representative of the repair station and incorporating the following information:
> (i) Identity of the aircraft, airframe, aircraft engine, propeller or appliance.
> (ii) If an aircraft, the make, model, serial number, nationality and registration marks, and location of the repaired area.
> (iii) If an airframe, aircraft engine, propeller, or appliance, give the manufacturer's name, name of the part, model, and serial numbers (if any); and
> (4) Include the following or a similarly worded statement—
> "The aircraft, airframe, aircraft engine, propeller, or appliance identified above was repaired and inspected in accordance with current Regulations of the Federal Aviation Agency and is approved for return to service.
> Pertinent details of the repair are on file at this repair station under Order No., ...."

38. William Reichardt, an FAA Aviation Safety Inspector, explained his concerns about the insufficient documentation of an aircraft's history:

Q. Could you tell us about that issue relating to documentation?
A. In most cases it is the lack of documentation to show origin, originality I guess you would call it.
Q. Can you explain a little further what you mean by that?
A. There will be no past history on anything on the aircraft, it will only just be starting from one point forward.
Q. And what's wrong with that type of documentation?
A. For substantiating times on life-limited components, in the case of helicopters there is no way of proving or substantiating the number of hours that become represented to an individual [buyer]....

39. Subsection (b) of Appendix B to 14 C.F.R. § 43 lays out the recordkeeping requirements for a major repair such as the one accomplished for Crane:

(b) For major repairs made in accordance with a manual or specifications acceptable to the Administrator, a certificated repair station may, in place of the requirements of paragraph (a)—

If it's an overhaulable part, time since overhaul is all you care about. If it's not an overhaulable part, if it's a life limited part like a rotor blade, all you need to know is how much time is on it and that's transferred forward and you get a new [component record card].

These notions were corroborated by other witnesses. Paul McKenzie, the Director of Maintenance at Big Valley Aviation, was asked if there was "any difference between records going back to the beginning of the helicopter and records that only reflect the current status of the aircraft and the components." He replied that "[t]he regulations state that the records must represent the current status of the aircraft. For instance, ten, 15 or 20 year past history of the aircraft usually has no bearing on its present day configuration." Plaintiff's expert witness, George Powell, stated that:

[Y]ou do not have to go back to the beginning of time. You need to account by an authorized representative of FAA or FAA themselves, in this case the repair station. You merely need to account—I say merely, but accurately need to account—for the total time or cycles.

You do not have to have all of the paperwork that preceded presented. You need to have records that you as an FAA station and an FAA designee are satisfied with and then note the total accumulation of time since the time that is decision time based on the current components. It's known as the current status of time. When I say time, I mean hours, cycles.

Furthermore, Steve Lotspeich had purchased several used helicopters prior to his purchase of S/N 2030. In those earlier purchases, he had seen the helicopters in various states of refurbishment; he had never received all of the log books dating back to the original purchaser; he had never received component records which traced entire component histories; and he had never received expert assistance in conducting his pre-purchase inspections. Crane's purchase situation with Southern Aero consequently was not unusual, nor were there obvious circumstances which should have left Lotspeich suspicious or uneasy about the helicopter. In addition, as Lotspeich testified, his experience in purchasing used helicopters to that point in time had always been "buyer beware." This time, in contrast, he was given the added assurance of a limited written warranty.

Crane Helicopter Services paid $698,600.00 for S/N 2030. Barry Desfor, associated with a nationally-known helicopter valuing publication called the *Helicopter Blue Book*, testified that $698,600 would have been a fair-market price in the first quarter of 1990 for a commercial 204B of the type which Crane purchased.

Subsequent to Crane's purchase of its helicopter, the FAA conducted a conformity inspection of the helicopter in response to Crane's request for certification as a 14 C.F.R. § 135 Commercial Operator. Ray Murphy, a principal operations inspector with the Oakland Flight Standards District Office of the FAA, assisted FAA maintenance inspector Don Schoolcraft and an FAA avionics inspector in performing the conformity inspection of S/N 2030 at that time. They found that S/N 2030 met the type data certification sheet, that there were a few minor errors in the helicopter's log books, and that there were no discrepancies with the component records.

Soon thereafter, Crane was first informed by the Forest Service that it might have something other than a commercial Bell 204B. Prior to beginning fire suppression work for the Forest Service, Crane's helicopter had to be inspected to receive a required Interagency Fire Card. One of the Forest Service representatives who conducted the inspection, Paul Markowitz, told Steve Lotspeich that he did not believe S/N 2030 was a 204B because it had ammunition chutes and its skids did not fit properly. Markowitz thought that Crane's helicopter had a UH–1 military airframe, and he informed Lotspeich of his suspicion.

The record shows that Steve Lotspeich did not ignore this warning or attempt to remain ignorant to the true configuration of his helicopter. He immediately suggested that he and Markowitz discuss the matter with the FAA, as the FAA had an office at the airfield

where the Forest Service inspection was being conducted. After Markowitz declined this offer and failed to issue the Interagency Fire Card, Lotspeich re-examined S/N 2030 and found no ammo chutes. He also contacted the FAA and verified that his particular skid gear was acceptable. Lotspeich asked Ray Murphy of the FAA about the matter, and Murphy informed him that the FAA had resolved the matter and had informed Markowitz that "everything was fine with the helicopter." After receiving an Interagency Fire Card, issued by Markowitz, by mail shortly thereafter, there was no reason for Crane to believe that it possessed anything other than a Bell 204B.[40] As Linda Lotspeich noted at trial, "the allegations were, if I remember, something about the skids not fitting correctly and ... that there were ammo chutes under the floor. That was all that [Markowitz] brought up, and we were convinced that there was not a problem in either of those areas. The FAA confirmed that everything was fine."

Crane had even less reason to doubt the authenticity of its 204B after S/N 2030 passed inspections by the Forest Service in 1991, 1992 and 1993. In each of those years, Interagency Fire Cards were issued for Crane's helicopter and no discrepancies were found with respect to the helicopter's physical conformity to its type certificate. Moreover, the last inspection was a special conformity inspection which took place after the Forest Service encountered problems with other commercial 204Bs. Passing this last inspection, in particular, could have left Crane confident that it possessed a legitimate Bell 204B, because representatives of the FAA, the Forest Service and Bell Helicopter all participated. In fact, the Forest Service representative was the same man, Paul Markowitz, who had previously expressed doubts about S/N 2030.

In 1994, Crane's actions again demonstrated a desire to confront the issue of its helicopter's identity. In February of that year, James Burt's article about "rebuilt" helicopters appeared in Bell's customer newsletter. The article noted that "Bell Helicopter is in the process of reviewing its records and those of official agencies to identify destroyed aircraft and may delete these from its Type Certificate Data Sheet and from its publications subscription list." Concerned about his helicopter, Steve Lotspeich contacted Bell and learned that S/N 2030 was a possibility for removal from the type certificate data sheet. Bell said an inspection of S/N 2030 would be necessary to resolve the matter, and Lotspeich requested that it be done immediately. These actions contradict the government's assertion that Crane has attempted "to maintain some sort of plausible denial regarding knowledge of the questionable origins of its aircraft." To the contrary, Lotspeich appears to have tried to resolve any questions regarding the identity of his helicopter each time he was confronted with the issue.

The results of the ensuing inspections also cannot be seen as giving the Lotspeiches any sort of notice that they did not possess a commercial Bell 204B. Two Bell technical representatives inspected S/N 2030 and informed Steve Lotspeich and Bell Helicopter of their failure to conclude that S/N 2030 was anything other than a Bell 204B. Apparently not satisfied with that answer, Bell sent a Product Service Engineer, Tony Stier, to conduct another inspection.

While Stier identified nonconformities that he saw with the helicopter, Crane was justified in questioning his opinion for several reasons. First, two Bell technical representatives had just inspected S/N 2030 and reached an opposite conclusion. Second, despite an offer from Steve Lotspeich to discuss the matter with the FAA, Stier declined. Third, Stier said there was no need to write a formal report for his inspection and he left his handwritten notes with Crane. Fourth, Stier told Steve Lotspeich that he did not think Bell was going to take any action to remove S/N 2030 from the type certificate data sheet for the 204B.[41] Fifth, Stier's con-

---

40. The Forest Service discrepancy report for the 1990 inspection does not indicate any concerns regarding S/N 2030's paperwork or its physical conformity to the type certificate.

41. At trial, Stier stated that he came to the conclusion that Crane's helicopter was not a Bell 204B, but he could not remember the exact words which he used to convey that information

clusions were based, in part, on his belief that it would not be economically feasible to repair a helicopter from the condition depicted in S/N 2030's crash photos from the NTSB crash report. But, as plaintiff notes, "when Mr. Lotspeich asked Mr. Stier if he was an engineer, if he'd had any experience with the repair of helicopters, or if he was familiar with Southern Aero's facilities and the extent of their spare parts inventory, Mr. Stier's answer to all of these questions was 'no.'" Also relevant is the testimony of Southern Aero's Bill Williams regarding Stier's point of view:

> [The] statement by Mr. Stier was purely self-serving. He certainly doesn't possess any unique qualities to estimate the repair of a helicopter, which repair would hinge on several factors.
>
> If the price of the helicopter is sufficient to warrant the repair, you repair it. If you have a number of the required component parts, airframe or otherwise, in stock or that are obtainable, that becomes a factor. If you have the personnel qualified to do the repair at a reasonable labor rate, that becomes a factor. If you have the tooling, and included in the tooling would be the jig, the main frame jig, that obviously becomes a factor.
>
> I don't have any idea what Mr. Stier based his estimate on, and I question his knowledge in that respect.

Perhaps most telling is Bell's failure to take any formal action against Crane Helicopter Services, even though Bell insisted on a formal presence represented by counsel during portions of the trial. Bell is aware of the procedures for filing complaints against helicopter operators under 14 C.F.R. Part 13,[42] and had previously attempted to revoke

the airworthiness certificate of a different Bell 204B. Since Tony Stier did not feel it was necessary to discuss the issue with the FAA, and since Bell Helicopters did not file a formal complaint against S/N 2030 with the FAA, plaintiff reasonably could have concluded that Stier's opinion was mistaken and not adopted by Bell.

In late 1995, the Forest Service suspended Crane from ferrying firefighting personnel. On October 10, 1995, Paul Markowitz sent a letter detailing his allegations to Tom Tesseny of the FAA. Afterwards, Tesseny inspected S/N 2030 on two occasions and still found no problems with the records or the physical condition of the helicopter. Tesseny then wrote a letter to the Forest Service which specifically addressed and rebutted each of Markowitz's alleged nonconformities, and he provided a copy of this letter to Crane.

In conclusion, the court finds that, even if Crane's helicopter were not S/N 2030, the government has not proven that Crane exhibited reckless disregard with respect to that fact. As plaintiff notes:

> [T]he Crane helicopter has been inspected no less than forty (40) times since the Lotspeiches purchased it in 1990. It has had fifteen 100–hour inspections, two 1,000–hour inspections, five annual inspections, a Part 135 conformity inspection, seven annual Part 135 inspections, three special FAA conformity inspections, seven Forest Service/[California Department of Forestry] annual inspections, and a Forest Service conformity inspection. It may well be the most inspected helicopter in America. . . .

Following all these inspections, neither the Forest Service nor Bell Helicopter has ever filed a formal complaint with the FAA about

---

to Steve Lotspeich. He said that, when he left the site of the inspection, he "felt really confident that both Mr. and Mrs. Lotspeich knew that it was not a 204–B." Linda Lotspeich, at trial, agreed that Tony Stier initially had indicated their helicopter was not a 204B. Steve Lotspeich, however, apparently did not take that message away from their discussion. According to Lotspeich, after he suggested that they discuss the matter with the FAA, Stier responded that "it's really not a concern for the FAA. I wouldn't be concerned. The FAA has approved your helicopter. The Forest Service has approved your heli-

copter . . . I'd just go on about my business if I were you . . . ."

**42.** 14 C.F.R. § 13.5(a) (1994) reads:

Formal complaints.
(a) Any person may file a complaint with the Administrator with respect to anything done or omitted to be done by any person in contravention of any provision of any Act or of any regulation or order issued under it, as to matters within the jurisdiction of the Administrator. . . .

S/N 2030. The Forest Service has been aware of alleged nonconformities with Crane's helicopter since Paul Markowitz's first inspection of the aircraft in 1990, yet it continued to issue Interagency Fire Cards for the helicopter, year after year. No discrepancies with respect to type design configuration were ever mentioned on the Forest Service discrepancy reports. Similarly, the FAA never mentioned any nonconformities when it inspected S/N 2030 each and every year for Part 135 certification.

Crane bought a helicopter which was "represented, described, and sold as a 204B," and plaintiff continues to believe that S/N 2030 is a commercial Bell 204B today. Of the government's different fraud theories, reckless disregard under the False Claims Act is the minimum required standard of "knowledge" for a claimant such as plaintiff to have committed fraud. *See* 31 U.S.C. § 3729(b). The court agrees with Crane that the actions which plaintiff took are "inconsistent with a desire to remain ignorant of the 'true' nature of their aircraft. Crane deliberately invited Bell, the [Forest Service] and the FAA to inspect its aircraft on multiple occasions." Defendant has not convinced the court that Crane exhibited reckless disregard of a falsity in this case, let alone the more stringent knowledge requirements set forth under defendant's other fraud claims.

### CONCLUSION

After thoroughly considering the record in this case, including the parties' briefs and exhibits, and the voluminous testimony of numerous witnesses, the court concludes that the government has failed to prove that plaintiff's helicopter is not a commercial Bell Model 204B. Plaintiff's witnesses, particularly representatives of the FAA and Big Valley Aviation, as well as Steve and Linda Lotspeich, offered credible testimony as to the chronology of events and the level of knowledge possessed by the Lotspeiches, including their efforts to insure that the aircraft at issue continued to conform to all requirements. Therefore, each of defendant's fraud counterclaims fails, as the government has failed to prove that plaintiff made misrepresentations of fact or false statements when representing the identity of its helicopter.

Furthermore, even if plaintiff had misidentified its helicopter, Crane did not act in a manner indicative of a reckless disregard concerning the nature of S/N 2030. As reckless disregard is the minimum standard of knowledge which must be shown on the part of a fraud defendant under the fraud theories employed by the government, the government's counterclaims also fail for this reason.

**IT IS SO ORDERED**